1                IN THE UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3    UNITED STATES OF AMERICA,      )
                                    )  No. 3:20-CR-1299-AJB
4              Plaintiff,           )
                                    )
5    v.                             )  June 30, 2021
                                    )
6    JOHN ANGEL RODRIGUEZ,          )
                                    )  Courtroom 4A
7              Defendant.           )
     _____)  San Diego, California

8

9                     TRANSCRIPT OF PROCEEDINGS

10                     (Evidentiary Hearing)

11       BEFORE THE HONORABLE ANTHONY J. BATTAGLIA, DISTRICT JUDGE

12
     APPEARANCES:
13   FOR THE PLAINTIFF:       BRANDON KIMURA
                              Assistant U.S. Attorney
14                            U.S. Attorney's Office
                              Southern District of California
15                            880 Front Street, Room 6293
                              San Diego, CA  92101-8893
16                            (619)557-5610

17
     FOR THE DEFENDANT:       DIANE REGAN
18                            414 S. 4th Street
                              El Centro, CA  92243
19                            (760)879-2699
                              dmresq@yahoo.com
20

21

22
     COURT REPORTER:          AMANDA M. LeGORE
23                            RDR, CRR, CRC, FCRR, CACSR
                              U.S. District Court
24                            333 West Broadway, Suite 420
                              San Diego, CA 92101
25                            amanda_legore@casd.uscourts.gov

1

2

INDEX

3

4

5

Witness Index

6

7

| FOR THE PLAINTIFF: | Direct | Cross | ReDirect | ReCross |
|---|---|---|---|---|
| Jesus Viesca | 4 | 16 | | |
| Filemon Magana | 22 | 38 | | |
| Francisco Munoz | 47 | 56 | | |
| Steven Green | 64 | 68 | | |
| Frank Maldonado | 70 | 76 | | |
| Sean Mann | 79 | 86 | 88 | |

8

9

10

11

12

13

14

| FOR THE DEFENDANT: | Direct | Cross | ReDirect | ReCross |
|---|---|---|---|---|
| John Rodriguez | 92 | 95 | | |

15

16

Exhibit Index

17

18

| EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| 1 | Video File Labeled "Jesus Viesca" | 22 |
| 1 | File Number 88978 | 55 |
| 1 | 0004 | 90 |
| 2 | Dog Handler Training Records | 37 |
| 3 | DEA 13 Form | 90 |
| 4 | DEA-88 Consent-to-Search Form | 74 |

19

20

21

22

-oOo-

23

24

25

| | |
|---|---|
| 1 | (Wednesday, June 30, 2021; 9:44 a.m.) |
| 2 | |
| 3 | P R O C E E D I N G S |
| 4 | |
| 5 | THE CLERK:  Please be seated and come to order. |
| 6 | Calling number one on calendar, Case 20-CR-1299, United States |
| 7 | of America versus John Angel Rodriguez, on for evidentiary |
| 8 | hearing. |
| 9 | MS. REGAN:  Good morning, your Honor.  Diane Regan |
| 10 | for Mr. Rodriguez who is present, on bond. |
| 11 | THE COURT:  Good morning. |
| 12 | MR. KIMURA:  Good morning, your Honor.  Brandon |
| 13 | Kimura for the United States. |
| 14 | THE COURT:  And good morning.  Sorry for the late |
| 15 | start. |
| 16 | But now that we're together, let's get to the |
| 17 | witnesses in connection with this motion to suppress. |
| 18 | And who's going to be our first witness? |
| 19 | MR. KIMURA:  Your Honor, we call El Centro Police |
| 20 | Department officer, Jesus Viesca. |
| 21 | THE COURT:  All right.  Let's bring him on forward. |
| 22 | MR. KIMURA:  With your Honor's permission, can I |
| 23 | conduct my questioning from here? |
| 24 | THE COURT:  Sure.  That would be fine. |
| 25 | THE CLERK:  Please raise your right hand. |

4

Viesca - D - By Mr. Kimura

1        (Witness sworn.)

2        THE WITNESS:  Yes, I do.

3        THE CLERK:  Please take the stand.

4        THE WITNESS:  Thank you.

5        THE CLERK:  Please state your full name for the

6   record, and spell your last name.

7        THE WITNESS:  Jesus Viesca.

8        THE COURT REPORTER:  Can you pull the microphone

9   closer to you.  Thank you.

10        THE WITNESS:  Jesus Viesca, V-I-E-S-C-A.

11        THE COURT:  Thank you, sir.

12        Go ahead, Mr. Kimura.

13                    DIRECT EXAMINATION

14   BY MR. KIMURA:

15   Q.   Officer Viesca, who do you work for?

16   A.   I am currently employed with the El Centro Police

17   Department.

18   Q.   How long have you worked there?

19   A.   17 years.

20   Q.   And what are your assignments -- your current assignments

21   and duties?

22   A.   My current assignments are patrol.

23   Q.   Okay.  Were you -- Officer Viesca, were you on duty on

24   February 14th, 2020?

25   A.   Yes, I was.

Viesca - D - By Mr. Kimura

1   Q.   Approximately 10:30 p.m.?

2   A.   Yes, I was.

3   Q.   What were you doing that day?

4   A.   I was responding to a call of a possible battery at the

5   Jack-in-the-Box, located on South Fourth.

6   Q.   Are you familiar with the area?

7   A.   Yes, I am.

8   Q.   All right.  Is there anything in particular that you know

9   about that area?

10  A.   Yes.  It's a high-crime area.  We have a local convenience

11  store that's open 24 hours.  We have a -- a Jack-in-the-Box

12  that's 24 hours.  A couple of hotels in the area.  It's off of

13  a state -- state highway, Highway 86.  And off -- that crosses

14  an intersection with Interstate 8.

15  Q.   And is there a Jack-in-the-Box in that area?

16  A.   Yes, there is.

17  Q.   And across from the street from that, is there -- you

18  mentioned there's a hotel.  Is there a motel -- is there a

19  Motel 6?

20  A.   Yes.  There is a Motel 6 less than a block away, and

21  across the street from that is a Holiday Inn Express.

22  Q.   Okay.  What about the Motel 6?  Is there anything in

23  particular about the Motel 6, that you know of, about, or in

24  your experience?

25  A.   Yeah, it -- it has relatively cheap rates, which kind of

Viesca - D - By Mr. Kimura

1  draws people who are usually involved in -- in illegal

2  activity.

3  Q.   Now, were you the first person on scene?

4  A.   No, I was not.

5  Q.   When did you -- about how far after the dispatch call did

6  you arrive?

7  A.   Within a few minutes.

8  Q.   Now, were you equipped with a body-worn camera that day?

9  A.   Yes, I was.

10  Q.   And were you able to review footage from that camera?

11  A.   Yes, I was.  I did.

12  Q.   I am going to show you what's already been filed as

13  Exhibit number 1.  It is a video file.  Under -- it says,

14  "Jesus Viesca," and it's ending in 24746.

15          If you look at your screen, do you recognize the

16  scene?

17  A.   Yes, I do.

18  Q.   Is that from your body-worn camera?

19  A.   Yes, it is.

20  Q.   All right.  And have you been able to review this?

21  A.   Yes.

22  Q.   Is it a true -- is this entire video, is it a true and

23  correct copy of what happened that day?

24  A.   Yes.

25  Q.   All right.

Viesca - D - By Mr. Kimura

1    MR. KIMURA:  Your Honor, I just need -- I am not

2    going to -- I don't plan on playing all of this because I know

3    we are limited on time.  But I do plan on playing, you know,

4    clips of it.  And I will be fast-forwarding through it.

5    THE COURT:  Sure.

6    You might just want to identify by timestamp when you

7    skip ahead, so that the record is clear as to what was played

8    and what was omitted.

9    MR. KIMURA:  Yes, your Honor.

10   BY MR. KIMURA:

11   Q.   Let's start at the very beginning.  And I am pressing play

12   at literally zero, zero.

13   (Video playing with sound and not reported herein.)

14   BY MR. KIMURA:

15   Q.   And so I'm pausing at 0040.

16   What happens in that interaction?  What are you --

17   what are you -- first of all, who are the other two individuals

18   in that scene?

19   A.   The first two individuals on the scene is -- well, here,

20   the -- you have the blurry image stopped on is Officer Filemon

21   Magana.  He was working that night with me.  He's our K-9

22   handler.  And to the right of him is Officer Francisco Munoz.

23   Q.   What are they saying?

24   A.   We're discussing the altercation that transpired with

25   the -- Mr. Rodriguez and the other party involved, who's no

Viesca - D - By Mr. Kimura

1  longer on scene.

2  Q.   Okay.  And what did you understand about what had happened

3  at that point?

4  A.   That Mr. Rodriguez had been involved in an altercation,

5  and the other party had fled.

6       At that point we had -- the only information we

7  received was a partial plate -- or a plate number.

8  Q.   And when you say "altercation," what do you mean?

9  A.   A fight.

10  Q.   A fight?

11  A.   Yes.

12  Q.   And this is -- where is this located at?

13  A.   On South Fourth Street, at the Jack-in-the-Box.

14  Q.   Okay.  And when -- so you when with say "28," in there,

15  what do you mean?

16  A.   It means -- it's a ten code that we use for vehicle

17  registration.

18  Q.   All right.  And what did that provide -- what kind of

19  information did that provide you?

20  A.   It provided me with a -- the registered owner to that --

21  to the vehicle.  A further query of the name assigned to that

22  vehicle came up with an individual who we had in our system.  I

23  believe Jolene (phonetic) Gutierrez was her name.

24  Q.   All right.  I'm going to start again from exactly where

25  we're starting at, with 0040.

Viesca - D - By Mr. Kimura

1              (Video playing with sound.)

2   BY MR. KIMURA:

3   Q.   All right.   So stopping at timestamp two minutes exact.

4             What happened in that -- in that clip that we saw

5   from approximately 0040 to -- to two minutes?

6   A.   So I conducted a query on the license plate number that

7   was provided by dispatch and came up with the registered owner

8   and her associate.

9             So, at this point, we're starting to put the pieces

10  of the puzzle together on who would be the potential assailants

11  of this battery were.

12  Q.   And when you say there are some codes there that were

13  being said by Officer Munoz, a 211 -- what is a 211?

14  A.   A 211 is a robbery, a Penal Code -- a state penal code for

15  robbery.

16  Q.   And what is a 243?

17  A.   A battery.

18  Q.   And you were able to look these individuals up because

19  they had previously -- you said they hooked before.   What is a

20  hook?

21  A.   A hook is an arrest.   It's terminology we use for being

22  arrested.

23  Q.   All right.   And Officer Munoz said that he was familiar

24  with these individuals.   Is that correct?

25  A.   Correct.

Viesca - D - By Mr. Kimura                10

1   Q.   All right.  Jump ahead to 2:17 here.

2              THE COURT:  "2:17" you said?

3              MR. KIMURA:  Yes, your Honor.

4              (Video playing with sound.)

5              MR. KIMURA:  I'm going to pause at 2:40, here.

6   BY MR. KIMURA:

7   Q.   So you -- you say "slinging dope."  What does that mean?

8   A.   It's -- it's another term for selling -- selling drugs.

9   Q.   Okay.  Why did you think that -- and who were you

10  referring to when you were saying that?

11  A.   I'm referring to Mr. Rodriguez.

12  Q.   All right.  Why did you say that?

13  A.   Well, as I mentioned before, I have been -- I --

14             THE COURT REPORTER:  I'm sorry.  I couldn't

15  understand what you said.

16             THE WITNESS:  As I mentioned before, I have been

17  employed with the city of El Centro for 17 years, during which

18  time I've served in multiple capacities.  One of which, being

19  assigned to the Drug Enforcement Administration from 2009 to

20  2014.

21             In that capacity, I have worked undercover, and I

22  handled thousand -- thousand-pound quantities, arrests of

23  narcotics that came from -- that come from the Republic of

24  Mexico into the country.

25  Q.   Well, let me start -- before we get into a narrative --

Viesca - D - By Mr. Kimura

1   A.    Sure.

2   Q.    -- were you previously familiar with the defendant?

3   A.    I -- by mere sight, yes, at this point.

4   Q.    You didn't know his name but you knew by -- who he was?

5   A.    Yes.

6   Q.    Okay.  And had you, because of your -- during your course

7   of duties and especially patrol, gone by his -- his residence

8   before?

9   A.    Yes, I have.

10  Q.    All right.  And prior to becoming a -- a police officer,

11  what were -- where were you employed?

12  A.    I worked for the Imperial County Sheriff's Department as a

13  correctional officer.

14  Q.    All right.  And how long did you do that?

15  A.    I did that for -- from 2001 to 2004.

16  Q.    Now, you said you were familiar with the defendant by

17  sight and you were familiar with his residence.  How was that

18  relevant?

19  A.    It's relevant because I -- I would notice individuals,

20  that I recognized from my previous employment at the sheriff's

21  department, at -- at Mr. Rodriguez's residence.  Not inside but

22  obviously outside, during the course of my patrol duties.

23  Individuals who were involved in criminal activity at one

24  point.

25  Q.    Okay.  And that's just -- you met them while basically

Viesca - D - By Mr. Kimura

1  they were in jail?

2  A.    Correct.

3  Q.    Okay.  And, also, did you notice anything else about

4  Mr. Rodriguez's habits?

5              MS. REGAN:  Your Honor, objection.  Calls for

6  speculation.

7              THE COURT:  Overruled.  And, in terms if you know.

8  So it's a yes or no.

9              THE WITNESS:  Yes.

10  BY MR. KIMURA:

11  Q.    All right.  What, if anything, was relevant in his habits,

12  to your experience?

13  A.    In my experience, his -- his washing of his vehicles.

14  Q.    Did you often observe him washing his vehicle?

15  A.    Yes.

16  Q.    How is washing your vehicle at all relevant to, you know,

17  potentially slinging dope?

18  A.    Washing -- washing one's vehicle was not -- is not

19  particularly in and of itself illegal.  However, multiple

20  washings during the course of a week is -- is strange.  And it

21  raises red flags for me, as a patrolman, and having the

22  experience coupled with -- or associated with work in the Drug

23  Enforcement Administration.  I am aware that people involved in

24  transporting narcotics frequently wash their vehicles to mask

25  or get rid of the odor of narcotics.

Viesca - D - By Mr. Kimura

1  Q.   All right.  Is there anything else that -- all that -- all

2  that is relevant to?

3  A.   Not at this point.

4  Q.   Okay.  Moving forward to 3:20 -- approximately 3:24 in the

5  video.  3:25.

6          (Video playing with sound.)

7  BY MR. KIMURA:

8  Q.   All right.  Stopping at 4:17.

9          So can you take us from approximately 3:25 to 4:17.

10  What are you doing near the vehicle?

11  A.   So I'm -- I'm inspecting the vehicle on -- around the --

12  around whatever's in plain sight.  At this point, I haven't

13  gone into the vehicle.  I have no reason to go into the vehicle

14  at this point.  But I do notice a couple of large bags inside

15  the vehicle.  And -- and, you know, at some point, Officer

16  Magana approaches me and says that the assailants had gone

17  inside the suspect's vehicle.  Which raised another concern, as

18  to why anyone would want to go inside this vehicle.

19          The -- the bags --

20  Q.   So just -- just to back up here.

21          In terms of going into the vehicle, this is during

22  the assault on Mr. Rodriguez.  Is that correct?

23  A.   Correct.

24  Q.   All right.  And what happened?  What did Officer Magana

25  say happened during the assault?

1  A.   So, during the assault, one of them -- one of the

2  assailants is involved in an altercation with Mr. Rodriguez at

3  another point.  Another individual was going -- had gone

4  into -- Mr. Rodriguez's vehicle.

5  Q.   Okay.  And why is that relevant to you?

6  A.   It's another cause for concern.  It raises a concern of

7  why someone would be interested in going into his vehicle,

8  having in mind that these two assailants, having just queried

9  them on the database and knowing that they had robbed

10  someone -- they have a history of robbing someone, they have a

11  history of battery.  So I'm starting to -- I'm trying to piece

12  together the -- the actual crime that occurred, whether it's --

13  whether it's a straight-up robbery and Mr. Rodriguez is an

14  actual victim, or whether they were there to conduct a business

15  transaction or a drug deal that had gone wrong, considering

16  Mr. Rodriguez's --

17        MS. REGAN:  Objection, your Honor.  Calls for

18  speculation --

19        THE COURT:  Overruled.  This is what he was thinking

20  at the time.

21        THE WITNESS:  Or whether Mr. Rodriguez had been

22  involved in a drug ring.

23  BY MR. KIMURA:

24  Q.   All right.  And then you say you see -- what did you see

25  in there?  I think you said something about a trash bag -- a

Viesca - D - By Mr. Kimura

1   trash bag and a backpack?  Is that --

2   A.   That is correct.

3   Q.   So what was visible?  What actually did you see in there?

4   Because we can't see where your light is going there.

5   A.   If I'm not mistaken, it's a backpack and a trash bag, that

6   contained an unknown object.

7   Q.   And what is that -- how is that relevant to you?

8   A.   It's relevant to me because it -- again, it draws me back

9   to the narcotics trafficking aspect of my career.

10          In investigating drug traffickers, they would

11  frequently package -- package narcotics in backpacks, duffel

12  bags, trash bags.

13  Q.   You eventually get to speak -- so, first of all, what

14  is -- why are you not speaking to Mr. Rodriguez at this point?

15  A.   He's currently being attended to by -- by paramedics.

16          In a case like this, the -- the care and treatment of

17  an individual is the -- is at the forefront of the

18  investigation.  We want to make sure that he's taken care of.

19  And so we're affording him the opportunity to.

20  Q.   So at some point did you get to speak to Mr. Rodriguez?

21  A.   Yes.

22  Q.   I'm going to skip ahead to approximately timestamp seven

23  minutes into -- into the video, here.

24          (Video playing with sound.)

25  BY MR. KIMURA:

16

Viesca - X - By Ms. Regan

1  Q.   I'm going to pause at 7:15.

2       So what -- what happened there?

3  A.   So my partner, Officer Francisco, is obtaining

4  Mr. Rodriguez's information for -- for his report.  And I

5  noticed Mr. Rodriguez has a -- a -- a Rolex watch.  And it's a

6  pretty flashy -- flashy watch.

7       So I mentioned -- I mentioned -- I bring it to his

8  attention.  That's -- you know, that's a nice watch.  And I ask

9  him how much it's worth.

10      Again, that -- that, in and of itself, is not

11 illegal.  Respectfully, I was more concerned with his response.

12 And as you can see in the video, he -- he deflects the response

13 to me how much it was.  And he says it's a couple bucks at a

14 pawnshop.  So immediately that just kind of was something else

15 to -- to kind of raise my concerns -- that he didn't want to

16 give me an actual value of the watch.  That he said it was --

17 he minimized the fact that it was not expensive.  That he

18 wouldn't get much for it at a pawnshop.

19      MR. KIMURA:  Your Honor, no further questions for

20 this witness.

21      THE COURT:  Okay.  Ms. Regan, any questions?

22                    CROSS-EXAMINATION

23 BY MS. REGAN:

24 Q.   Yes.  Officer Viesca --

25      MS. REGAN:  Should I use the podium?

1       THE COURT:  Yeah.  Use the podium.  Speak into the

2   mic, so we can hear you.

3   BY MS. REGAN:

4   Q.    Okay.  So when you testified that it was a high-crime area

5   right there by the Jack-in-the-Box, couldn't it -- all right.

6   Have you arrested a lot of people right there --

7   A.    Yes.

8   Q.    -- at the Jack-in-the-Box?

9   A.    In that general area.

10  Q.    Okay.  But, I mean, specifically at the Jack-in-the-Box,

11  have you ever arrested people before?

12  A.    I'm sure I have but I --

13  Q.    All right.  But are you aware of any other drug activity

14  at that Jack-in-the-Box that you've seen in the past?

15  A.    Yes.

16  Q.    Okay.  And how many instances of that have you seen?

17  A.    I can't put a number.  It's multiple.

18  Q.    Okay.  And you said right across the street is a

19  convenience store.  That's a 7-Eleven.  Right?

20  A.    Correct.

21  Q.    Okay.  And so the reason you said it was a high-crime area

22  is because of the -- the nexus of the freeway and the hotel and

23  the Jack-in-the-Box and the -- the 24-hour store.  Correct?

24  A.    Coupled with the -- the narcotics activity that goes on

25  there.

18

Viesca - X - By Ms. Regan

1   Q.   Okay.  And is there -- are there other areas -- well --

2          Strike that.

3          Okay.  So when you were talking about the -- the

4   assailant, Jolene Gutierrez, you said that she was a victim in

5   some crimes.  Is that correct?

6   A.   I don't recall if I mentioned she was a victim.  I -- I

7   believe she was involved in a robbery and a battery.

8   Q.   Okay.  And I want to talk to you a little bit about his

9   washing of his car.

10         So how many times would you say that Mr. -- my client

11  has washed his car in one week, that you know of?

12  A.   I -- I don't -- I don't know, ma'am.

13  Q.   And you said that it was to mask odors of narcotics?

14  That's what you believed that people would wash their cars for.

15  Correct?

16  A.   Not all of that.  Not all of that.  I mentioned that --

17  the frequent washing of cars is associated to narcotics

18  trafficking in a sense where they attempt to mask or get rid of

19  the odor of narcotics being transported would be --

20  Q.   Okay.  So are you saying the narcotics would have an odor

21  on the outside of someone's car?

22  A.   No.

23  Q.   Okay.  So what you're saying, when people are washing

24  their car, he washes the exterior of his car.  Correct?

25  A.   Yes.

1  Q.   Okay.  You didn't see him vacuuming his car or --

2  A.   No.  No, ma'am.  Actually, that was --

3  Q.   That's a yes-or-no question.

4       Did you see him back -- putting air freshener in his

5  car?

6  A.   Not air freshener.

7  Q.   Okay.  Vacuuming it out?

8  A.   Yes.

9  Q.   Okay.  How many occasions did you see him do that?

10 A.   Maybe a handful of times.

11 Q.   Okay.  Over how long a period of time?

12 A.   I can't tell you.  It's --

13 Q.   Okay.  Months?

14 A.   Sure.  Yes.

15 Q.   Okay.  All right.  So you --

16      Okay.  And I want to talk to you about when you were

17 looking inside the car.  You didn't see anything in plain view,

18 did you?

19 A.   I'm sorry?

20 Q.   You didn't see anything illegal in plain view, did you?

21      THE COURT:  Are you saying the time within the car?

22      MS. REGAN:  Yeah.  When he was looking in the car.

23 I'm sorry.

24 BY MS. REGAN:

25 Q.   When you were looking in the car, you didn't see anything

Viesca - X - By Ms. Regan                    20

1   illegal, did you?

2   A.    No.

3   Q.    Okay.  And then you saw a backpack.  Correct?

4   A.    Correct.

5   Q.    And backpacks are used by other types of people, other

6   than just drug traffickers, aren't they?

7   A.    Yes.

8   Q.    Like students, maybe?

9   A.    Yes.

10  Q.    And different -- different people use backpacks.  And you

11  also testified, at that time when you looked in, you didn't see

12  any reason to go into his car at that point.  Correct?

13  A.    Correct.

14  Q.    Okay.  And then when you were talking about him being the

15  victim of -- of this assault, and when they went in the car,

16  these people -- you thought maybe these people might have

17  robbed him.  Correct?

18  A.    Correct.

19  Q.    Okay.  And he put -- could have been being robbed if he

20  was just a regular person, isn't that right?

21  A.    Yeah, he could have.

22  Q.    Right.  So the people that you -- you suspected of robbing

23  him, did they just rob drug dealers?

24  A.    I couldn't tell you.

25  Q.    Okay.  But, I mean -- so he could have just been a regular

21

Viesca - X - By Ms. Regan

1  citizen and been assaulted by these people?

2  A.   Yes.

3  Q.   Okay.  Okay.  Talking about the Rolex watch that you --

4  that you said that you saw on his hand, are you a watch expert?

5  A.   No, ma'am.

6  Q.   Okay.  Can you tell the difference between a real Rolex

7  watch and a fake Rolex watch?

8  A.   No, ma'am.

9  Q.   Okay.  So if somebody -- okay.  So you don't know if that

10  Rolex watch was actually a Rolex watch or not, did you?

11  A.   No, I do not.

12  Q.   Okay.  And it could have been a fake knockoff one.  Isn't

13  that right?

14  A.   It's possible, yes.

15          MS. REGAN:  Okay.  Okay.  I don't have any more

16  questions.

17          THE COURT:  Mr. Kimura, anything else?

18          MR. KIMURA:  Yes, your Honor.  The United States

19  calls Officer --

20          THE COURT:  We're done with this witness?

21          MR. KIMURA:  Oh, I'm done with this witness, yes.

22          THE COURT:  All right.  Thank you, Officer.

23          You may step down.  May we excuse him for today at

24  least?

25          MR. KIMURA:  Yes, your Honor.

Magana - D - By Mr. Kimura

1          THE COURT:  Ms. Regan, any objection to excusing him?

2          MS. REGAN:  No.

3          THE COURT:  All right.  You're excused, sir.  Thank

4    you very much.

5          And we referred to the Exhibit 1, that we informally

6    admitted.  But I will, at this time.  It was identified,

7    foundation laid; otherwise relevant.

8          So your next witness, sir.

9                    (Exhibit 1 received.)

10         MR. KIMURA:  Yes.  He's going to bring in Officer

11   Filemon Magana.

12         THE COURT:  Come on forward, Officer, over here to

13   your right, and we'll swear you under oath.

14         THE CLERK:  Please raise your right hand.

15         (Witness sworn.)

16         THE WITNESS:  I do.

17         THE CLERK:  Please take the stand.  Please state your

18   full name for the record and spell your last name.

19         THE WITNESS:  Filemon Magana, M-A-G-A-N-A.

20         THE COURT:  Thank you, sir.

21         Go ahead, Mr. Kimura.

22                    DIRECT EXAMINATION

23   BY MR. KIMURA:

24   Q.   Officer Magana, who do you work for?

25   A.   I'm currently employed with the El Centro Police

23

Magana - D - By Mr. Kimura

1   Department.

2   Q.   And how long have you worked there?

3   A.   Going on 20 years now.

4   Q.   And what are your current assignments and duties?

5   A.   I just finished my assignment of canine officer and will

6   be transitioning back to patrol.

7   Q.   Okay.  On February 14th, 2020, were you a canine officer?

8   A.   I was.

9   Q.   All right.  Were you also on duty that day?

10  A.   I was.

11  Q.   All right.  Were you on duty at approximately 10:30 p.m.

12  that day?

13  A.   Yes, I was.

14  Q.   What happened around that time, if anything?

15  A.   There was a dispatch -- or dispatch had dispatched a call

16  to Officer Munoz in reference to a physical fight at a local

17  eatery, Jack-in-the-Box.

18  Q.   Are you familiar with the area?

19  A.   Yes, I am.

20  Q.   Is there anything special about that area that you're

21  aware of?

22  A.   That area is -- it's a state highway.  It's right next to

23  the Interstate 8 freeway.  There is a lot of eateries around

24  there.  That's a 24-hour eatery, actually.  And, you know, gas

25  stations and motels.

Magana - D - By Mr. Kimura

1        Because that area, there is so much traffic and

2    movement all times of the day and night, we do have a large

3    population of transients, the panhandling that goes on down

4    there, along with that.  Because of that, also, it's a very

5    high-crime area around there.  We have a lot of drug use, a lot

6    of vehicle break-ins, and burglaries in that area.

7    Q.   Now, were you the first person to arrive to the dispatch

8    call?

9    A.   I was.

10   Q.   All right.  What happened when you got there?

11   A.   When I got there, there was a male subject, fit the

12   description, was bleeding from the mouth and unsteady on his

13   feet.  I was being flagged down or waved down, also, by the

14   staff at Jack-in-the-Box.

15   Q.   Okay.  So, first of all, let's start off with the person

16   that was bleeding from the mouth.

17        Did you recognize anyone in the court today that you

18   met that night?

19   A.   I do.

20   Q.   Who do you recognize?

21   A.   The gentleman seated next to the lady with the glasses.

22   Q.   And what -- and can you tell me what kind of article of

23   clothing he's wearing?

24   A.   He's got -- it looks like a white or a beige color

25   long-sleeve shirt, button-down shirt.

Magana - D - By Mr. Kimura

1          MR. KIMURA:  Your Honor, may the record reflect that

2   Officer Magana has identified the defendant?

3          THE COURT:  Any objection?

4          MS. REGAN:  No objection.

5          THE COURT:  Okay.  The record will reflect that the

6   Officer has identified the defendant, Mr. Rodriguez.

7   BY MR. KIMURA:

8   Q.   What, if anything, did he say to you?

9   A.   Real quickly, he gave me a synopsis of what happened.  He

10  said that he was assaulted by a male and a female.

11         He was there at the drive-through, the

12  Jack-in-the-Box.  And as he pulled out, he noticed his soft

13  drink was watered down.  When he was stopped at the front

14  doors, the front entrance of the eatery and was going to go in

15  and either refresh or get another drink, some type of argument

16  with the male -- the other male ensued.  Quickly turned into a

17  physical.  While he was being assaulted by the male half, the

18  female joined in.  And then, basically, took over the assault,

19  if you would.

20  Q.   Did anything happen during that time while -- did he tell

21  you anything about what happened?  If they went into his car,

22  or anything?

23  A.   He had only mentioned that the male half, once the female

24  was assaulting him, that the male half had gone around to the

25  driver's side of his pickup and opened the front door.  That's

Magana - D - By Mr. Kimura

1   what he had told me.

2   Q.   Did you find that unusual at all?

3   A.   I did.   Because he said he didn't know who the two people

4   were.   And I asked if anything was taken.   He said he wasn't

5   sure.   He didn't know.

6   Q.   Now, did you speak to the staff at that point?

7   A.   I did.

8   Q.   What did they say happened?

9   A.   The staff actually had -- had also told me what he had

10   said about -- it was a male and a female.   They both had

11   assaulted him.   Looked like it was an argument over where he

12   had parked.   Because there is a narrow little entrance there at

13   the front.   And that the -- it looked like the arguments

14   calculated very quickly into the physical.

15          They actually gave a description of the male and the

16   female, the description of the vehicle, their last known

17   direction, and then supplied us with a license plate to that

18   vehicle as well.

19   Q.   Now, based on all of the information you had -- just at

20   that point, not further -- did you find anything about the

21   situation unusual?

22   A.   Just the fact that at the time, when we had the

23   information that was given, obviously one of the things we want

24   to know quickly is to locate the people and also, for

25   prosecution, ask the gentleman, you know, if there was -- he --

Magana - D - By Mr. Kimura                    27

1   desired prosecution.  Because I know I had officers in the

2   area.  And he was like, "No, no, I don't want anything done."

3              And I thought that was kind of odd because we had --

4   it was a just-occurred assault.  And especially the information

5   that was given to us, quickly given back to us.

6   Q.   And that included a description of the car and the

7   description of the people.  Is that correct?

8   A.   Description of the vehicle, a description of the car --

9   the license plate, which quickly we were able to get -- he --

10  the address of the -- of the vehicle as well.

11  Q.   Was that close by?

12  A.   Yes, it was.

13  Q.   Now, I'm going to show you -- first of all, are you --

14  were you -- were -- were you able to view body cam footage from

15  that -- that -- that night?

16  A.   Yes.

17  Q.   All right.  And do you -- looking at the screen, do you

18  recognize, generally, what -- what this is?

19  A.   Yeah.  That's going to be the front of the

20  Jack-in-the-Box.  It's actually facing to the east.  And just

21  to the east of that is Fourth Street, which is a state highway,

22  and just to the south of the Interstate 8.

23  Q.   Okay.  And in the corner, here, we have the -- the file

24  number, which is basically Jesus Viesca, ending in 24746.

25              Have you been able to view this video before?

Magana - D - By Mr. Kimura

1   A.   Yes.

2   Q.   And is it a true and correct copy of what happened that

3   night?

4   A.   Yes.

5   Q.   And I'm going to direct you to timestamp two minutes and

6   40 seconds in that video.  And we're just going to press play

7   here.

8   A.   Okay.

9           (Video playing with sound.)

10  BY MR. KIMURA:

11  Q.   2 -- I'm stopping at 2:52.

12          What did you say there?

13  A.   I was saying I believe it was maybe it was just -- it was

14  more than just what we had right here.  More than just -- I

15  believe I said -- can we play it back?

16  Q.   Yeah.  Not a problem.  I'll bring -- actually, so go back

17  to 2:40.  I'll just start at 2:34.

18  A.   Okay.

19          (Video playing with sound.)

20  BY MR. KIMURA:

21  Q.   So I'm going to stop at 2:53.

22          So you -- the first thing you say is "Still" -- and

23  you mumbled a little bit.  But "still doesn't want to"?

24  A.   Prosecute.  Still doesn't want to prosecute.  And maybe it

25  was more than just the assault.  Maybe it was just more than --

Magana - D - By Mr. Kimura

1          At that time, we also -- if you heard Officer Munoz,

2    the names had came out, which we were familiar with the

3    subjects.

4    Q.   And when you say, "Still didn't want to prosecute," is

5    that what you were referring to prior?  That he didn't want

6    to --

7    A.   Correct.

8    Q.   Okay.  So can you explain that?

9    A.   Well, I mean, normally we have someone that has been

10   assaulted the way he had been and then we had -- now you have

11   someone going into your truck.  Still don't know what the heck

12   they were doing, you know, for that.  And then the information

13   we had was given -- the staff did a great job of getting a

14   description of the vehicle, the two people they could ID, and

15   also the license plate.  And then we had a proximity -- close

16   proximity of where we believed they -- they lived.  And then,

17   shortly after that, gathering information from dispatch the

18   names which we were familiar with.  And still providing that

19   to -- the victim still not wanting prosecution.

20   Q.   And then explain your second statement.

21          Maybe it was something more than --

22   A.   Once we -- once, I said, I heard what the names and -- of

23   the subjects that came -- that were ran across, that were

24   associated, that we believed, to the vehicle -- obviously, at

25   that time we weren't for sure if these were the two.  But once

Magana - D - By Mr. Kimura

1   we had the names, the familiarization is there's H and S

2   drug -- involvements on -- excuse me -- on both parties.  Once

3   we saw that there was this assault, there was all of this

4   information, and still it was like, "No, I don't want anything

5   done."

6           And my being -- at that time, working a lot of drug

7   cases, interdiction, I believe I said, well, there's maybe more

8   to this than just the simple assault.

9   Q.   I'm fast-forwarding to --

10          THE COURT:  Let me just interrupt.  When you said H

11  and S matters, you're talking about health and safety code

12  violations --

13          THE WITNESS:  Health and safety.  Yes, sir, drug

14  codes.

15          THE COURT:  Just to complete the record.  Go ahead.

16  BY MR. KIMURA:

17  Q.   Going to 3:30, and I'm going to press play here.

18          (Video playing with sound.)

19  BY MR. KIMURA:

20  Q.   Okay.  Stopping at 3:39.  What did you say there?

21  A.   I said that he did say they came to his car.  And they got

22  to his car, why would they come around to the car and get into

23  the car.

24  Q.   And what were you making reference to, at this point?

25  A.   What's that?

1  Q.   What are you making reference to, at this point?

2  A.    In reference to them coming around to the vehicle.   I

3  mean, first of all, the assault was -- we -- what we first

4  believed to be because of the blocking of the driveway.

5          And then the male half, as he is kind of being

6  subdued, the female then takes over, which frees up the male

7  half.   It seems he doesn't stay engaged into a physical fight

8  where his female partner is now engaged with the male.   He

9  leaves her fighting the male, and then goes around to the truck

10 and opens the truck and looks into the truck.   That struck me

11 as very odd.

12 Q.   Fast-forward to five minutes exact.   I'm going to press

13 play here.

14          (Video playing with sound.)

15 BY MR. KIMURA:

16 Q.   So stopping at 5:19.

17          Said something about ripping off.   What -- what did

18 you say there?

19 A.   You know, I -- it was kind of muffled.   If you can play it

20 one more time, so I can hear it.   I believe -- I'm sorry.

21          (Video playing with sound.)

22 BY MR. KIMURA:

23 Q.   I'm sorry.   Press pause.

24          (Video playing with sound.)

25 BY MR. KIMURA:

Magana - D - By Mr. Kimura

1   Q.   So I'm stopping right there.  What did you say there?

2   A.   I had said it sounded like the guy was, you know, trying

3   to rip him off.  I believe he said it was about him ripping him

4   off, trying to steal from him, you know.

5   Q.   So at that point, did you think this was some type of

6   robbery?

7   A.   Actually, yes.  It was some type of a botched robbery.

8   But it was -- something wasn't right about it for the fact that

9   the female then took over.  And then that part was -- seemed

10  kind of weird.  That he would go around to the driver's side of

11  that truck.

12  Q.   Now, you're a canine officer at this point.  Did you ever

13  run your canine around the vehicle?

14  A.   I did.

15          MR. KIMURA:  Start at 8:08.  Eight minutes and eight

16  seconds in the video, here.

17          (Video playing with sound.)

18  BY MR. KIMURA:

19  Q.   So I'm pausing here.  You -- where are you in this video?

20  A.   I'm to the -- just on the left side of the truck, on the

21  driver's side of the pickup.

22  Q.   And what are you doing?

23  A.   So what I'm doing is, is I have my dog out.  We're doing

24  an exterior free-air sniff of the vehicle.

25          Started at the front grill of the truck.  And as you

Magana - D - By Mr. Kimura

1   can see, if -- if you were watching the video, the dog, Max, my

2   partner, he's working his way along the front driver's side

3   quarter panel, working his way to the front door.  Working

4   basically along the seams as he's sniffing.  As soon as he gets

5   to that back -- the back crew cab door of the pickup, he has a

6   change in behavior, where he -- you'll see him make an abrupt

7   stop.  He'll turn.  And he sits.

8           With my dog, it's a passive alert, is what he does.

9   He comes across a narcotic odor, he'll give a sit and stare

10  straightforward.  That's usually -- for me, that's his

11  indication of an alert.

12  Q.    Okay.  So, first of all, what kind of dog is your dog?

13  A.    He's a Belgian hound.

14  Q.    And what is he trained to do, if anything?

15  A.    He's trained in the detection of narcotics, and he's also

16  a patrol dog.  So a bite dog, most people call them.

17  Q.    And in terms of narcotics, what types of narcotics are you

18  talking about?

19  A.    Heroin, methamphetamine, cocaine, ecstasy, marijuana.

20  Q.    And how long had you worked with him, at that point?

21  A.    Right there, I was probably already with him two, two and

22  a half years.  He had a prior handler before I got him.

23  Q.    And can you just explain for the record what it means to

24  be -- well, first of all, trained as a -- as a narcotics

25  detection dog?

Magana - D - By Mr. Kimura                34

1   A.    For the dog?

2   Q.    Yes.

3   A.    Sure.  So this is my second dog that I've worked.  For

4   the -- on the dogs, the -- the training is -- we go to what's

5   canine training, dog training.  For the dog, it's anywhere --

6   it can be anywhere from two months -- actually, the dogs catch

7   on a lot faster than we humans do.  They -- once they're

8   imprinted on the odor, whether it's any type of narcotics,

9   guns -- you name it -- whatever that they're -- they're

10  imprinted on, once they're imprinted on, we, as the handler,

11  then work with those dogs and the training is continuously.  I

12  train up in the -- I trained up in the Oceanside, Carlsbad area

13  every Wednesday.  Once a week, every week, I did that.

14          And the training, basically, on that, is continuous.

15  What we're doing is we are always working with the dogs.  And

16  that is so that we are always either proofing them off things

17  in different environments.  Whether it's food, we'll put

18  articles of food out.  These are all things that the dogs go

19  through, so it's not just, you know -- there's the -- the drugs

20  that he's being trained, the odor.  But there's also all of the

21  other odors that come around it to proof them off and keep them

22  around; even if that's other pets.  So it's very, very precise

23  work, if you work with those dogs.

24  Q.    Are you and/or the dog required to pass any training on

25  certifications?

Magana - D - By Mr. Kimura                35

1   A.   Yes.   Yes.   So we did -- I believe on ours, we're
2   quarterly.   And those pertained to article searches, drug
3   searches.   And these were all done by a certified handler that
4   we go to.   That's Carlsbad, Oceanside, and numerous agencies
5   use.   They certify us, which is basically having narcotics --
6   real narcotics, not the -- the odor, or the official ones they
7   use, the ones that are -- I forget -- pseudo ones.   We use real
8   narcotics for it.   And they are placed in what we would
9   normally be doing:   Vehicles, buildings, anywhere that we
10  normally would go on patrol, they are tested.   That way they
11  have to pass -- be certified quarterly, as well as our bite
12  work is on top of that.
13  Q.   Do you keep records of these trainings and certifications?
14  A.   We do.
15  Q.   And is that in the -- are you required to in the regular
16  course of your business?
17  A.   Yes, per our police policy.
18  Q.   And do you know if records were kept for your dog?
19  A.   They were.
20  Q.   I'm going to show you what's been previously docketed as
21  Exhibit number 2 to our motion to -- opposition to motion to
22  suppress.
23              (Witness handed documents.)
24              (Judge handed document.)
25  BY MR. KIMURA:

Magana - D - By Mr. Kimura

1   Q.   Officer Magana, have you been able to review Exhibit

2   number 2?

3   A.   Yes.

4   Q.   What is Exhibit number 2?

5   A.   It is a stack of what is our -- our weekly training.

6   Basically, what this is, is this gives us an idea of -- we'll

7   go in there, and we'll put down the odor or the -- if it was an

8   article, we put down what it was.  You'll see there we have,

9   like, heroin, cocaine, methamphetamine, ecstacy.  They'll go --

10  also, it goes down -- sometimes, if you look, we'll see blanks.

11  And what that means is we don't always train where the dog's

12  always going to find drugs.  Because, obviously, when we go out

13  there, it doesn't mean there's drugs every place we go.  So we

14  have to train with what is called blanks.  And that's going to

15  be a car that's completely clean.  There's no -- that we know

16  of, there hasn't been any kind of drugs or any type of odor.

17  We run the dogs on there.

18          And that's to also train the dogs -- okay, you don't

19  smell an odor?  We move on to the next one.  And that's how we

20  work with these dogs.  So you'll see blanks there.

21          We'll put usually where they are, if they are hidden.

22  We'll put it like in the car.  They'll be in the console, in

23  the rear quarter panel.  Any place we can think of that, you

24  know, we know that on the streets that we want our dog to get

25  up in there and start working.

Magana - D - By Mr. Kimura                    37

1  Q.   So are these true and correct copies of those records?

2  A.   Yes.

3          MR. KIMURA:  Your Honor, the United States asks to

4  admit Exhibit -- what's been marked as Exhibit 2 into the

5  record.

6          THE COURT:  Okay.  Any objection?

7          MS. REGAN:  No objection.

8          THE COURT:  They are received.

9              (Exhibit 2 received.)

10 BY MR. KIMURA:

11 Q.   Ultimately, Officer Magana, in both your training and your

12 experience with -- with the canine, in this instance, have you

13 found him to be reliable in determining whether the presence of

14 narcotic odors is in any place that he alerts?

15 A.   Yes.

16 Q.   I am going to start up the video again at 8:19.

17          (Video playing with sound.)

18 BY MR. KIMURA:

19 Q.   All right.  Ending at 8:43.

20          What -- what are you asking him and what is he saying

21 back to you?

22 A.   I'm asking in reference to if he's using any drugs, if

23 he's smoked anything.

24          When he said he had marijuana, he smoked marijuana,

25 he said he had it on him.  There -- there -- the smell of --

Magana - X - By Ms. Regan

1   of -- of marijuana coming from the vehicle.  One of the things

2   that I also ask anyone when there's an alert for that is due to

3   the fact that there are -- when I come across a lot of what we

4   call loads vehicles, my dog can give me an alert.  And I'll --

5   I'll usually ask the person, "Is there anything in there"?  And

6   they'll let me know, "Yeah, you know, I just smoked some

7   marijuana I did."  And the reason I do that is we do have a lot

8   of cases where people will try to mask a drug with another

9   drug.  And -- meaning, like, they'll say, "Yeah, a friend of

10  mine had some weed in there."  And, okay, so that's the reason

11  why your dog is alerting.  And come to find out, we have other

12  narcotics on board -- heroin, methamphetamine -- other than

13  what was originally told.

14  Q.   And, of course, he admitted to you that he had had

15  marijuana?  Had smoked marijuana?  Is that correct?

16  A.   Yes, and that he had it on him.

17           MR. KIMURA:  Your Honor, no further questions for

18  this witness.

19           THE COURT:  Okay.  Ms. Regan, any cross-examination?

20           MS. REGAN:  Yes.  Oops.  (Pause.)

21                    CROSS-EXAMINATION

22  BY MS. REGAN:

23  Q.   Good morning, Officer Magana.  How are you?

24  A.   Good morning.  Good morning.  How are you?

25  Q.   Fine, thanks.

Magana - X - By Ms. Regan

1          Okay.   Okay.   When you were talking about the area
2   there by the Jack-in-the-Box, you said it was a high-crime
3   area.   Correct?
4   A.    Yes, ma'am.
5   Q.    And you said because of -- there are a lot of transients?
6   A.    We do have a large amount of -- population of transients.
7   Q.    And homeless people?   A lot of homeless people?   I
8   guess --
9   A.    Yes.
10  Q.    -- same thing.
11         And so there is a lot of crime related to those type
12  of people.   Right?
13  A.    There is.
14  Q.    Okay.   You mentioned car break-ins?
15  A.    Yes.
16  Q.    And a lot of drug use by those type of people?
17  A.    Yes.
18  Q.    Okay.   And you also mentioned that there was a motel in
19  the area -- two motels in the area.   Correct?
20  A.    There is.
21  Q.    Okay.   So these motels are right off of the freeway.
22  Correct?
23  A.    Yeah.   They're just -- just north of the freeway.
24  Q.    Okay.   So, I mean -- all right.   Let me see.   Okay.
25         So the kind of crime that you're talking about in

1  that area, pretty much has to do with sort of petty crimes

2  caused by these type of people?

3  A.   Well, we've had everything from petty to felony crimes.

4  We've had assaults with deadly weapons.  We've had shootings.

5  So, I mean, kind of runs the gamut.

6  Q.   Okay.  So when we -- you talked about the -- the -- the

7  people opening the door to his truck.  The people that we're

8  referring to, these are thieves -- thieves, right?  And drug

9  dealers?

10 A.   No, ma'am.  The person I was referring to, that -- the

11 gentleman who had told me was actually the male that assaulted

12 him -- initially assault the him was accompanied by the female.

13 Q.   Right.  But you know who that male was, don't you?

14 A.   Yes, we do.

15 Q.   Okay.  And he has a record for being a -- for robbing

16 people?

17 A.   Actually, it was the female that had a robbery conviction,

18 I believe.

19 Q.   Okay.  But he has a record of assaulting people?

20 A.   He's got some assault, and I believe there were some drug

21 charges as well.

22 Q.   Okay.  So -- and when you talked to -- and it was strange

23 that he opened the -- the driver's side door.  The driver's

24 side door was right there, right in front of the --

25 A.   Passenger side door, ma'am.

1   Q.   Oh, passenger side door.

2   A.   He went around the truck.

3   Q.   Okay.  Let's see.

4            And when you talked about the people from 7-Eleven

5   describing to you what happened in great detail, they -- they

6   told you it was an argument over a parking space.  Correct?

7   A.   I didn't talk to anyone from 7-Eleven.

8   Q.   Oh, not 7-Eleven.  I meant Jack-in-the-Box.  I'm sorry.

9   A.   Jack-in-the-Box.

10  Q.   Yeah.

11  A.   I'm sorry?

12  Q.   And you're familiar with that area right there in front of

13  Jack-in-the-Box.

14  A.   Yes, ma'am.

15  Q.   And you said it was a very narrow area?

16  A.   Yes.

17  Q.   Okay.  And so if someone were to park a truck right there,

18  like Mr. Rodriguez, it would block the lane.  Correct?

19  A.   If he parked in the center, it would.

20  Q.   Okay.  The way he was parked, was he blocking the lane?

21  A.   He was partially -- I mean, if a car could get through

22  there, it would be a tight squeeze.

23  Q.   Okay.  Okay.  So -- and when the people at the

24  Jack-in-the-Box told you they -- that they thought it was

25  because of the way he had parked, that the altercation had

1  happened.  Right?

2  A.   They thought it was because of where he had parked.

3  Q.   Okay.  All right.  Let's see.

4       And when you talked about Mr. Rodriguez not wanting

5  prosecution -- I mean, how -- how hurt was Mr. Rodriguez?

6  A.   He was -- like I said, he was unsteady on his feet, he was

7  bleeding from his mouth, and he was complaining of pain to his

8  ribs.  Where, I guess, she was kicking him pretty hard.

9  Q.   Okay.  Did he have to be hospitalized?

10 A.   He refused.

11 Q.   Okay.  And let's see.  And you speculated that he didn't

12 want to have prosecution because maybe he was involved in some

13 other sort of illicit activity?  Is that what you said?

14 A.   No.  Originally, he did not want prosecution.

15      What I did was -- like I said, part of my

16 interdiction at the time was with the facts that we had.  To

17 me, it seemed then -- it was strange that he did not want

18 prosecution.  The information that we had of the suspects that

19 could be identified, they were -- in a short proximity where

20 the vehicle came back, the registration, the people that -- the

21 names came back to the vehicle as well.  And the fact that, you

22 know, he had been assaulted, we asked -- he didn't want

23 anything done.  When he talked about also the gentleman coming

24 around the front.  With that background, my thought was there

25 was more to this than just a simple assault.

Magana - X - By Ms. Regan

1  Q.   Okay.  But it could have been that Mr. Rodriguez just

2  didn't want to be involved.   Right?

3  A.   It could have been.

4  Q.   And don't you have a lot of victims of crime who do not

5  want to press charges?

6  A.   Yes.

7  Q.   And lots of victims of violence?

8  A.   Yes.  Sure.

9  Q.   Domestic violence, especially?

10  A.   Sure.

11  Q.   So just the fact that somebody doesn't want to press

12  charges against a person who assaults them doesn't necessarily

13  mean that they're involved in illegal activity?

14  A.   That wasn't the only reason, like I said.

15  Q.   Okay.  Well -- okay.  So, let's see.

16        So you also testified that you thought it was odd

17  that somebody would -- would go into his car.

18  A.   Yes.

19  Q.   These people who -- who assaulted him, as you said

20  earlier, were criminals.   Right?

21  A.   They had a criminal background.

22  Q.   Right.  Well, wouldn't it -- well, and criminals break

23  into people's cars, don't they?

24  A.   Yes, they do.

25  Q.   Okay.  All right.  And talking about Max, your dog.  So I

Magana - X - By Ms. Regan

1    looked at -- in Max's records, he did pretty well.  But he

2    isn't always on point, is he?

3    A.   He's actually a really good dog.  Right?  I mean, as --

4    for him being an odor dog, his training is very extensive.  So

5    to say he's a perfect dog, no.

6    Q.   Okay.  And he's had extensive training on the smell of

7    marijuana also.  Right?

8    A.   I'm sorry?

9    Q.   He's had extensive training on how to detect marijuana?

10   A.   Yes.

11   Q.   Okay.  Not just the other kinds of drugs?

12   A.   He's had marijuana, heroin, cocaine nexus.

13   Q.   So if someone were to have smoked marijuana in a vehicle

14   sometime prior to Max doing an exterior sniff, would Max alert

15   on the vehicle?

16   A.   If the odor were still present, he would.

17   Q.   Okay.  And in this case, I think you mentioned there was

18   an odor of marijuana coming from the car?

19   A.   There was.

20   Q.   Okay.  So is it -- Max alerted on that marijuana odor,

21   didn't he?

22   A.   If I could tell you that, then I would probably wouldn't

23   be working here.  What their nose smells -- like I said, if he

24   could talk, that would be a whole different story.

25   Q.   Well, I'm saying you -- you detected it?

Magana - X - By Ms. Regan

1    A.   I detected it.  But, of course, like I said, I -- that

2    wasn't the only narcotic in the vehicle.  So I couldn't tell

3    you exactly which one he was alerting to.

4    Q.   Right.  But the smell of marijuana was -- I mean -- well,

5    the smell of marijuana was so obvious that even a human can

6    detect it, I'm sure Max probably detected it also.

7            So, also, you said that Mr. Rodriguez said that he

8    had marijuana on him.  Correct?

9    A.   He actually said that.

10   Q.   And did you check to see how much marijuana he had on him

11   at the time?

12   A.   I did not.

13   Q.   Okay.  So you don't know whether it was a legal amount or

14   an illegal amount?

15   A.   Like I said, I was working the dog, so I did not pat him

16   down or check him.

17           MS. REGAN:  Okay.  All right.  No further questions.

18           THE COURT:  Mr. Kimura, any questions?

19           MR. KIMURA:  No questions, your Honor.

20           THE COURT:  Just to be clear, Officer, when the dog

21   alerts, that means there was some kind of narcotic or narcotics

22   in the area he surveilled?

23           THE WITNESS:  That's correct.

24           THE COURT:  He doesn't sit differently if it's

25   marijuana or stand if it's cocaine or holler if it's

1  methamphetamine?

2          THE WITNESS:  No, your Honor.  He just gives the one

3  alert.  And it's then up to us to do the old police work.

4          THE COURT:  All right.  Thank you.

5          THE WITNESS:  You're welcome.

6          THE COURT:  You want me to excuse this witness?

7          MR. KIMURA:  Yes, your Honor.

8          MS. REGAN:  (Nods head.)

9          THE COURT:  You're excused.  Thank you.

10          THE WITNESS:  Thank you, sir.

11          THE COURT:  Let me interrupt you, Mr. Kimura, to take

12  up another short matter, if we could.

13          Oh, thank you.

14          (Handed document by clerk.)

15          THE COURT:  And you can just sit in place, we'll work

16  around you two.  But let's go ahead and call the bail matter,

17  and then we'll get back to Mr. Rodriguez's case.

18          (Recess taken at 10:45 a.m.)

19          (Resuming at 10:53 a.m.)

20          THE COURT:  And let's return, then, to the Rodriguez

21  matter.

22          And your next witness, Mr. Kimura.

23          MR. KIMURA:  Yes.  The United States calls El Centro

24  Police Officer Munoz.

25          THE COURT:  Munoz.

Munoz - D - By Mr. Kimura                47

1               (The Court and court reporter conferring.)

2               THE COURT:  We'll take a five-minute break for the

3      convenience of certain people.

4               (Recess taken at 10:54 a.m.)

5               (Resuming at 10:58 a.m.)

6               THE CLERK:  Please remain seated and come to order.

7      This court is once again in session.

8               THE COURT:  I see we have Officer Munoz in the

9      witness stand.  Has he been sworn yet?

10              THE CLERK:  Not yet.

11              THE COURT:  Let's do it.

12              THE CLERK:  Please raise your right hand.

13              (Witness sworn.)

14              THE WITNESS:  Yes.

15              THE CLERK:  Please be seated.  And please state your

16     full name for the record, and spell your last name.

17              THE WITNESS:  Francisco Munoz, M-U-N-O-Z.

18              THE COURT:  Thank you, sir.

19              Go ahead, Mr. Kimura.  You may examine the witness.

20                      DIRECT EXAMINATION

21     BY MR. KIMURA:

22     Q.   Officer Munoz, who do you work with?

23     A.   I am employed by the City of El Centro, with the El Centro

24     Police Department.

25     Q.   How long have you worked with them?

Munoz - D - By Mr. Kimura

1   A.   About ten and a half years now.

2   Q.   And what is your current assignment and duties?

3   A.   I am currently -- I'm currently a detective, and I'm

4   assigned to a task force with Homeland Security Investigations.

5   Q.   Okay.  And at the time of February 14th, 2020, what was

6   your assignment and duties?

7   A.   I was on patrol.

8   Q.   And were you on duty on February 14th, 2020?

9   A.   Yes.

10  Q.   And what were you doing at approximately 10:30 p.m.?

11  A.   I was dispatched to a call.

12  Q.   Can you describe the call?

13  A.   It was an altercation between three individuals at 2100

14  South Fourth Street, at the Jack-in-the-Box.

15  Q.   All right.  And did you meet anyone there that you see in

16  court this morning?

17  A.   Yes.

18  Q.   Could you identify him, and where he's sitting, and an

19  article of clothing that he's wearing?

20  A.   He's sitting next to his attorney, Ms. Regan.  And it's

21  John Angel Rodriguez.  He has glasses, a white-striped shirt.

22          MR. KIMURA:  Your Honor, may the record reflect that

23  he has identified the defendant?

24          THE COURT:  Any objection?

25          MS. REGAN:  No objection.

1          THE COURT:  The record will so reflect.

2    BY MR. KIMURA:

3    Q.   Do you know if there was body cam footage of that incident

4    from that evening?

5    A.   Yes.

6    Q.   Were you able to review that footage?

7    A.   Yes.

8    Q.   All right.  Showing you -- if you're looking at the screen

9    right now -- what has been marked previously Exhibit number 1.

10   Jesus Viesca, ending in 24746.  Do you see that?

11   A.   Yes.

12   Q.   Are you familiar with this video file?

13   A.   Yes.

14   Q.   Have you been able to view it?

15   A.   Yes.

16   Q.   Is it a true and accurate depiction of what occurred that

17   evening?

18   A.   Yes.

19   Q.   I'm going to take you to timestamp 0050.  Or 49, excuse

20   me.

21          (Video playing with sound.)

22   BY MR. KIMURA:

23   Q.   Stopping at two minutes exactly.

24          Officer Munoz, first of all, are you in this video?

25   A.   Yes.

Munoz - D - By Mr. Kimura

1  Q.   How do you know?

2  A.   I can hear my voice.

3  Q.   All right.  What, if anything, are you saying at that

4  point?

5  A.   We're discussing the -- the possible suspects of the

6  altercation.

7  Q.   Now, how did you get any information about who these

8  people might be?

9  A.   It was -- their license plate was provided during the

10  call, when they left the scene in their vehicle.

11  Q.   And when did you rec -- when did you determine that you

12  knew them?

13  A.   Once -- once I typed in the vehicle registration, it came

14  back to Ms. Gutierrez, Jonelle (phonetic) Gutierrez.

15         I have been -- I have patrolled small towns, so

16  they're frequent fliers.

17  Q.   What do you mean by "frequent fliers"?

18  A.   I mean, I've been -- I would deal with them on a regular

19  basis at times.

20  Q.   And what if any -- what do you mean, dealing with them?

21  Can you be more specific?

22  A.   Responding to calls for service where they were either

23  suspects.  Or I'm doing interdiction, traffic stops, or

24  disturbances.  Or I -- I remember Jonelle was a victim once.

25  Q.   And you say "211" there.  What does 211 refer to?

Munoz - D - By Mr. Kimura                    51

1   A.   That's the penal code for robbery.

2   Q.   And what relationship did that have to anything --

3   A.   I had responded as a cover officer to a -- to -- what came

4   out as a battery and also an altercation report, where Jonelle

5   and her significant other, Carlos Alejandre, were arrested for

6   robbery.

7   Q.   What if anything else in your experience to these two

8   individuals did you know about them?

9   A.   That they're drug users.

10  Q.   Moving ahead to 5:24.

11            (Video playing with sound.)

12  BY MR. KIMURA:

13  Q.   Now, I'm stopping here at 5:35.

14            What are you doing in this clip?

15  A.   I was looking at the -- at the truck because I recognized

16  it.

17  Q.   How did you -- what about -- first of all, you are walking

18  to the back of the truck.  Is that correct?

19  A.   Yes.

20  Q.   What about -- anything about this truck did you recognize?

21  A.   The Raiders decal that he had on the rear -- rear

22  windshield.

23  Q.   I am going to press play at 5:35, here.

24            (Video playing with sound.)

25  BY MR. KIMURA:

Munoz - D - By Mr. Kimura

1   Q.   Pressing pause at 6:16.

2            MS. REGAN:  Your Honor, just an objection.  Hearsay

3   as to what the people told the officer.

4            THE COURT:  Well, overruled as it goes to the state

5   of mind of the officer and the assessments they're making as to

6   probable cause.  It's not offered for the truth of what they

7   said but what these officers believed or were considering at

8   the time.

9            Next question.

10  BY MR. KIMURA:

11  Q.   Yes.

12           So can you explain what you were saying in that clip?

13  You start off with you recognize the car.  Start from there.

14  A.   Okay.  So what I was discussing with Officer Viesca was

15  that I had -- I had seen this truck around town several times

16  while I was out patrolling.

17           I had seen -- I had recently seen it at a doughnut

18  shop, where it's a high-crime -- high-crime trafficking area.

19  I had seen Mr. Rodriguez in the driver's seat, in possession of

20  his vehicle, making contact with one of our known drug dealers.

21  I've seen that.  I have seen him in his truck, as well,

22  throughout the city and in the -- when I referred to the east

23  side, it's a high-crime area as well in the city of El Centro.

24           So I was always curious to see who was driving

25  this -- this truck.  It hadn't been seen in a while, lately.

Munoz - D - By Mr. Kimura                    53

 1   And now we see it in high-crime areas with known -- with a

 2   known drug dealer.

 3           So I was thinking, hey, you know what?  This guy

 4   might be a distributor; while I was out patrolling, doing

 5   interdiction.

 6   Q.   Is that -- you say "connect" in there.  That -- that you

 7   were referring to the individual at the doughnut shop.  You

 8   said something about her being -- and I'll play it again, so we

 9   can just -- we'll walk through it here.

10           Start at 5:34, here.

11           (Video playing with sound.)

12   BY MR. KIMURA:

13   Q.   So you say she slangs dope.  What do you mean by that?

14   A.   Slangs dope, as in she -- she sells drugs.

15   Q.   Okay.  Pressing -- that's at 5:54, stopped.  Pressing play

16   again.

17           (Video playing with sound.)

18   BY MR. KIMURA:

19   Q.   Stopping at 6:07.

20           Now, you said they look all shook, when you drive up

21   into the doughnut shop.  What do you mean by that?

22   A.   Yes.  As I was passing by the parking lot they both looked

23   at me, like -- they both looked -- they looked -- they appeared

24   to be scared.  Like, oh, something's going on.  Oh, whoa,

25   there's a cop there.  When she was -- when the individual was

Munoz - D - By Mr. Kimura                54

1   up to his driver's side window and making contact with

2   Mr. Rodriguez.

3   Q.   And you say that -- you refer -- you said something about

4   being a drug connect.   Who were you referring to, and what does

5   drug connect mean?

6   A.   I was referring to Mr. Rodriguez, that he -- that he was

7   possibly this individual's drug connection, who distributes --

8   who she purchased large amounts of narcotics, for her to resell

9   on the street for her own profit.

10  Q.   Now, we're -- was Mr. Rodriguez eventually arrested?

11  A.   Yes.

12  Q.   And did you bring him back to the station at that point?

13  A.   Yes.

14  Q.   And was there an interview conducted?

15  A.   Excuse me?

16  Q.   Was there an interview conducted?

17  A.   Yes.

18  Q.   Now, were you able to -- was that interview videotaped?

19  A.   Yes.

20  Q.   Were you able to review that videotape?

21  A.   Yes.

22  Q.   I'm showing you what's also on Exhibit 1, file number

23  Francisco Munoz, and the interview ending -- file ending in

24  89 -- 88978.

25       Are you familiar with this video, Officer Munoz?

Munoz - D - By Mr. Kimura

1   A.   Yes.

2   Q.   All right.  This is a true and correct copy of the

3   interview that happened?

4   A.   Yes.

5   Q.   All right.

6        MR. KIMURA:  And, your Honor, we would move to admit

7   this file, as part of Exhibit number 1.

8        THE COURT:  Any objection?

9        MS. REGAN:  No objection.

10       THE COURT:  Okay.  It's received.

11            (Exhibit 1 received.)

12  BY MR. KIMURA:

13  Q.   We're not going to go through you the entire video,

14  Officer Munoz.  But did you provide him his *Miranda*?

15  A.   Yes.

16  Q.   Did he consent to give you a statement to that point?

17  A.   Yes.

18  Q.   All right.  Did -- at some point, did he also consent to

19  allowing you to look into his phone?

20  A.   Yes.

21  Q.   All right.  Before this interview happened, was there any

22  other interactions with the -- with -- substantive interactions

23  with the defendant in terms of statements?

24  A.   No.

25  Q.   Okay.  Did you guys make any threatening gestures or

1   threats before you got on camera?

2   A.   No.

3            MR. KIMURA:  All right.  No further questions for

4   this witness, your Honor.

5            THE COURT:  Okay.  Ms. Regan, any cross-examination?

6            MS. REGAN:  Yes, your Honor.

7                        CROSS-EXAMINATION

8   BY MS. REGAN:

9   Q.   Good morning.  How are you?

10  A.   Good morning, ma'am.

11  Q.   Okay.  Detective Munoz, congratulations on being a

12  detective.

13  A.   Thank you.

14  Q.   So you said you were on patrol this day, on the 14th of

15  February of 2020.  Correct?

16  A.   Yes.

17  Q.   And -- and at that time, when you arrived at the

18  Jack-in-the-Box with the other officers, you were involved in

19  looking up who the suspects were.  Correct?

20  A.   Yes.

21  Q.   And -- and you said on the -- the tape that there was a

22  Carlos Alejandre and a Jonelle Gutierrez who were involved in

23  the altercation?

24  A.   Correct.

25  Q.   And you said you knew those people because -- well, one,

57

Munoz - X - By Ms. Regan

1   because it's a small town and that they were frequent fliers.

2   Correct?

3   A.    Correct.

4   Q.    And so these are people who are involved in a lot of

5   criminal activity?

6   A.    At times.

7   Q.    Okay.  And they've been involved in robberies?

8   A.    Yes.

9   Q.    And also in violent crimes.  Correct?

10          Well, robbery is a violent crime.  But other, like,

11   assaults?

12   A.    Correct.

13   Q.    Okay.  So -- and you know these people -- well, and you

14   suspected these people are drug users.  Correct?

15   A.    Correct.

16   Q.    Okay.  But you don't know if those people knew my client,

17   do you?

18   A.    No, I did not know.

19   Q.    No.  But I'm just saying, there was no connection between

20   those people and my client except for this altercation, was

21   there?

22   A.    That's correct.

23   Q.    Okay.  So, to your knowledge, he had never met them before

24   this day?

25   A.    That's correct.  I -- I don't know.

Munoz - X - By Ms. Regan

1  Q.   So -- and when you were looking in this truck, you

2  recognized the truck had a Raiders decal.

3          Aren't there a lot of trucks in El Centro with

4  Raiders decals on them?

5  A.   That's correct.

6  Q.   Okay.  And you've seen this truck around town at various

7  locations.   Right?

8  A.   Yes.

9  Q.   At the doughnut shop?

10  A.   Yes.

11  Q.   And when you're talking about the doughnut shop in a

12  high-crime area, which -- which area of town were you talking

13  about?

14  A.   We're talking about the one on 4th and Olive, which is --

15  at 4th and Olive.

16  Q.   The new one?

17  A.   Yes, the new one.

18  Q.   Okay.  And, there, you saw him talking to a female that

19  you recognized as a drug dealer?

20  A.   Correct.

21  Q.   But you had no prior knowledge that -- of him knowing this

22  person?

23  A.   No.

24  Q.   Right?

25          And you didn't know what they were talking about?

1   A.    No.

2   Q.    You didn't know if she was asking him for money?

3   A.    No.

4   Q.    Or if she was asking for a doughnut?

5   A.    No, I didn't know.

6   Q.    Cup of coffee?

7          And, also, do you know where Mr. Rodriguez works?

8   A.    Yes.

9   Q.    And where does he work?

10  A.    He mentioned he worked at CalEnergy.

11  Q.    Okay.  But do you know if he also works in other parts of

12  the city?

13  A.    No.

14  Q.    Okay.  And when you talked about the east side of El

15  Centro, how big of an area are you talking about?

16  A.    Well, what's the name of it?  That's -- I mean, I can't

17  tell you exactly how big it is.  But it's -- it's past the

18  railroad tracks from -- there, the tracks east of Fourth

19  Street.  And it goes down to -- it's about -- I don't know.

20  Like six -- six or seven blocks from those tracks, to -- to the

21  east.  And then there's quite a few -- quite a few more up

22  north, and south of it.

23  Q.    So, basically, it's a residential area.  Correct?

24  A.    Yes.

25  Q.    Pretty much.

1          And -- and in that residential area, it's a pretty

2    low-income place, isn't it?

3    A.    Yes.

4    Q.    And so -- but there are a -- I mean, the people who live

5    there are not exclusively criminals, are they?

6    A.    No, of course, not.

7    Q.    Okay.  So there is -- so when you say there's a lot of

8    high crime on the east side, what do you mean by that?

9    A.    Patrolling the city for about ten years, already, I would

10   already know what -- I -- I have responded -- I respond to that

11   neighborhood several times, for different types of crimes.

12   Make different arrests, in that same area as well.

13   Q.    Okay.  So --

14   A.    And when I say "high crime areas," it's because I've

15   experienced it.  I've seen it.  Responded to it.

16   Q.    So there have been people -- residential burglaries,

17   different types of crimes that you've seen in these areas?

18   A.    Yes.

19   Q.    Okay.  And when you were talking about seeing him at the

20   doughnut shop and -- and you said that Mr. Rodriguez and the

21   woman looked -- I don't know if you said scared.  They were

22   sort of alarmed when you -- when you pulled up.  Is that right?

23   A.    Correct.

24   Q.    And that maybe -- and that -- aren't people alarmed a lot

25   of times when you pull up?

Munoz - X - By Ms. Regan

1  A.   No, I did not pull up.  I didn't ask them about -- I was

2  passing by.  I was just driving right by.  I was on my way to a

3  call.  And -- I mean, any other person would just -- just --

4  they would just go about what they were doing, their

5  conversation, if she was asking them for coffee or money or

6  whatever it is.

7          But, I mean, you're -- based on my training and

8  experience, whenever I get these -- these looks on their face

9  that appear to be alarmed, they stop what they are doing, I

10  suspect, then, that something is going on.  That -- you know,

11  some sort of illegal activity or something that -- that --

12  maybe they're wanted.  I don't know.

13  Q.   Right.

14  A.   So that's just -- those are red flags for me.

15  Q.   But you don't know that they're doing anything wrong?

16  A.   No, don't know.

17  Q.   You don't know what they're talking about?

18  A.   No.

19  Q.   Okay.  And you don't know Mr. Rodriguez.  Correct?

20  A.   That's correct.

21  Q.   And you have no information -- I mean, well, you said that

22  you thought he might be her -- her drug connection.

23          Do you have any other information about that?

24  A.   No.

25  Q.   Okay.  So that's just what you thought?

Munoz - X - By Ms. Regan

1   A.    Correct.

2   Q.    Based on the proximity you had seen him, in places in El

3   Centro, different areas?

4   A.    Based on her -- her involvements, her -- her criminal

5   background, what she's done, what she's doing.

6   Q.    The girl at the doughnut shop?

7   A.    Yes.

8   Q.    Okay.  And did you say it was a fat girl at the doughnut

9   shop?  Did you say -- I couldn't understand --

10  A.    No.  I was describing to Officer Viesca, the night

11  prior -- like the day prior, we had responded to a call where

12  we encountered her with some other -- another female who was

13  heavyset.  And that's when I told him, "Hey, do you remember

14  when we encountered the fat girl?"  I was trying to have him

15  remember.

16  Q.    Okay.  I understand.  I just didn't know who the fat girl

17  was.

18             Okay.  So just to wrap it up, you have never met my

19  client before?

20  A.    No.

21  Q.    When you got there, your information was that he was the

22  victim of an assault?

23  A.    That's correct.

24  Q.    And you -- there was no prior relationship between him and

25  the assailants?

1  A.    That's correct.

2  Q.    And, basically, you didn't know anything about him except

3  for what you suspected?

4  A.    That's correct.

5           MS. REGAN:  I don't have any further questions.

6  Thanks.

7           THE COURT:  Okay.  Mr. Kimura, anything else?

8           MR. KIMURA:  Nothing from the United States, your

9  Honor.

10          THE COURT:  Okay.  Any objection to excusing this

11  witness?

12          MS. REGAN:  No objection.

13          MR. KIMURA:  Not from the United States.

14          THE COURT:  Okay.  Detective, you are excused.  Thank

15  you very much.

16          THE WITNESS:  Thank you.

17          And next, Mr. Kimura.

18          MR. KIMURA:  Yes, your Honor.

19          The United States calls Imperial County Sheriff's

20  Deputy Sergeant Steven Green.

21          THE CLERK:  Please raise your right hand.

22          (Witness sworn.)

23          THE WITNESS:  I do.

24          THE CLERK:  Please take the stand.  And please state

25  your full name for the record, and spell your last name.

1          THE WITNESS:  Steven Green, G-R-E-E-N.

2          THE COURT:  Thank you, sir.

3          Go ahead, Mr. Kimura.

4          MR. KIMURA:  Yes, your Honor.

5                    DIRECT EXAMINATION

6    BY MR. KIMURA:

7    Q.   Sergeant Green who do you work for?

8    A.   Imperial County Sheriff's Office.

9    Q.   And how long have you worked for them?

10   A.   For 12 years.

11   Q.   And what is your current assignment and duties?

12   A.   I'm a sergeant assigned to internal affairs.

13   Q.   Now, on February 27th, 2020, what was your assignment and

14   duties?

15   A.   I was assigned as a group supervisor for DEA task force.

16   Q.   Okay.  And what were you doing on approximately 11:30 a.m.

17   that day?

18   A.   We were waiting for Mr. Rodriguez to show up so I could

19   serve an arrest warrant.

20   Q.   Okay.  And what happened?  Can you start off with what --

21   your involvement in that?

22   A.   So my involvement, I was a supervisor for the group,

23   making the arrest.

24          So we were -- we were waiting for him to arrive home.

25   Showed -- he arrived at home.  And heard on the radio that he

Green - D - By Mr. Kimura

1   had pulled in the driveway.  The team made -- made an arrest.

2   And then I went up, as we were getting ready to talk to him

3   more.

4   Q.   Were you there at the initial -- when he was initially

5   contacted?

6   A.   No.

7   Q.   All right.  When did you get there?

8   A.   I arrived when he was already sitting next to the -- the

9   front door.

10  Q.   Approximately how much time had elapsed between the radio

11  message that he was home and the time that you arrived?

12  A.   A minute.  Maybe two minutes, at the most.

13  Q.   And what did you see when you got there?

14  A.   He -- he was standing next to the -- next to the -- on the

15  sidewalk, close to the front door.

16         Agents had asked him if we could do a cursory search

17  of the house, make sure there's no threats.

18  Q.   Is that what we understand as a safety sweep?

19  A.   A safety sweep.

20  Q.   Okay.  Was he handcuffed at this point?  Do you recall?

21  A.   At this point, I don't recall.  I believe he was --

22         THE COURT REPORTER:  I'm sorry?  I believe he was?

23         THE WITNESS:  I believes he was, but I'm not a

24  hundred percent sure.

25  BY MR. KIMURA:

1   Q.    Now, the safety sweep didn't find anything.   Correct?

2   A.    Correct.

3   Q.    Now, what happened next?

4   A.    Next, Agent Mann read him his *Miranda* -- Agent Mann was

5   going to start asking questions.   I talked to Agent Mann,

6   reminded him to read *Miranda* rights.   And then he asked for

7   permission to search the house.

8   Q.    All right.   And do you know if he -- he received

9   permission?

10  A.    Yes, he did.

11  Q.    All right.   Now, did you conduct a search of the home?

12  A.    No.   I stayed outside, with -- with Mr. Rodriguez.

13  Q.    What happened during this time?

14  A.    During this time, we just small talk.   Building rapport.

15  He had a little koi pond or fish pond out in the front of the

16  house.   Talked to him about that.   He told me he had built it,

17  him and his dad.   He had some netting over the top.   I asked

18  him what the netting was for.   He told me, "Well, the netting

19  is to keep the birds from eating the fish."   So just small

20  talk.

21  Q.    Did you tell him shut up at any point?

22  A.    No, I did not.

23  Q.    Did you threaten him at any point?

24  A.    No, I did not.

25  Q.    When -- did you see any other agent tell him to shut up or

Green - D - By Mr. Kimura                    67

1    threaten him in any way?

2    A.    No.

3    Q.    Did Mr. -- did you hear Agent Sean [sic] specifically tell

4    him to shut up at any point before or while he was asking --

5    A.    No, he did not.

6    Q.    Did Mr. -- Agent Sean threaten him, to get him to consent

7    to the search of the car?

8    A.    No, he did not.

9    Q.    Now, did you also encounter anyone else during that day?

10   A.    No.

11   Q.    Any -- any other member of Mr. Rodriguez's family?

12   A.    Be threatened?

13   Q.    No.  Did you encounter --

14   A.    Oh, encounter?  Yes.  Yes, the father, who was across the

15   street, and walked over to our location.

16   Q.    And can you talk about what -- how that interaction --

17   A.    The father walked over.  At first, I told him -- asked

18   him, "sir, can you just go back across the street.  Let us deal

19   with Mr. Rodriguez."  I didn't know it was his father, at the

20   time.  He told me he was his father, so I let him stay there.

21         Kind of talked back and forth with Mr. Rodriguez and

22   his father.  They both talked to me about the pond.

23         Mr. Rodriguez told me he saw us in the neighborhood

24   before we -- before Mr. Rodriguez showed up at the house.  And

25   he knew we were undercover units and knew something was up.

Green - X - By Ms. Regan

1    And he did tell me he did not give his son any -- any

2   notification that we were there.  Just decided that if -- if

3   his son did something, he had to live with it.

4   Q.   Now, can you describe the tone of your interactions with

5   Mr. Rodriguez, himself, and his father.

6   A.   It was casual -- casual conversation.  Just talking

7   about -- really, not much that pertained to the -- to the case.

8   Just building that little rapport and having a casual

9   conversation.

10  Q.   Were you polite?

11  A.   Yes.

12  Q.   Were they polite?

13  A.   Yes.

14       MR. KIMURA:  No further questions for this witness,

15  your Honor.

16       THE COURT:  Okay.  Ms. Regan, any questions?

17       MS. REGAN:  Yes, just a couple.

18                        CROSS-EXAMINATION

19  BY MS. REGAN:

20  Q.   So is it Deputy Green?

21  A.   Sergeant.

22  Q.   Sergeant Green.  I'm sorry.  Sergeant Green, good morning.

23       So you weren't there when the team first got there.

24  Correct?

25  A.   I was just down the street.

1  Q.   Okay.  But there was a period of time when Mr. Rodriguez

2  was with the other officers that you were not there?

3  A.   Correct.

4  Q.   Okay.  And how long about a period of time would that have

5  been?

6  A.   A minute, maybe two at the most.

7  Q.   Okay.  And you said that Agent Mann read the *Miranda*

8  rights to him.  Were you there for that?

9  A.   Yes.

10  Q.   And you witnessed that?

11  A.   Yes.

12  Q.   Okay.  And then were you there when they asked him for

13  consent to -- to search his house?

14  A.   Yes, I was.

15  Q.   Okay.  About -- did you have him sign a consent form?

16  A.   I wasn't present when the consent form was signed.  It was

17  a verbal consent.

18  Q.   Okay.  Was the consent -- do you know when the consent

19  form was signed?

20  A.   I don't know for sure.

21  Q.   Okay.  Okay.  And after the father came over, the father

22  was there for the entire time after that.  Correct?

23  A.   Correct.

24  Q.   So that was pretty much from the beginning?

25  A.   Correct.

 1                MS. REGAN:  Okay.  No further questions.

 2                THE COURT:  Anything else, Mr. Kimura?

 3                MR. KIMURA:  No, your Honor.

 4                THE COURT:  All right.  May we excuse the sergeant,

 5      then?

 6                MS. REGAN:  Yes.

 7                MR. KIMURA:  Yes.

 8                THE COURT:  No objection.

 9                You're excused, sir.  Thank you.

10                And next witness, Mr. Kimura.

11                MR. KIMURA:  Yes.  The United States calls DEA Agent

12      Frank Maldonado.

13                THE CLERK:  Please raise your right hand.

14                (Witness sworn.)

15                THE WITNESS:  Yes, ma'am.

16                THE CLERK:  Please take the stand.  And please state

17      your full name for the record, and spell your last name.

18                THE WITNESS:  Frank Maldonado, M-A-L-D-O-N-A-D-O.

19                            DIRECT EXAMINATION

20      BY MR. KIMURA:

21      Q.   Agent Maldonado --

22      A.   Yes, sir.

23      Q.   -- who do you work for?

24      A.   DEA, sir.

25      Q.   And how long have you worked for them?

Maldonado - D - By Mr. Kimura                    71

1    A.    Coming up around two years, a little more; give or take.

2    Q.    Were you on duty on February 27, 2020, at approximately

3    11:30 a.m.?

4    A.    Yes, sir.

5    Q.    What were you doing at that time?

6    A.    We were at Mr. Rodriguez's house.

7    Q.    And do you see anyone here today that you encountered that

8    day?

9    A.    Sorry.  One more time, sir.

10   Q.    Yeah.  Do you see and hear -- do you see anyone here today

11   that you encountered that day?

12   A.    Yes.  Mr. Rodriguez.

13   Q.    Can you point him out by where he's sitting and an article

14   of clothing that he's wearing?

15   A.    He's sitting over there (pointing) with white button-up

16   shirt and glasses, sir.

17         MR. KIMURA:  All right.  Your Honor, may the record

18   reflect that Agent Maldonado has identified the defendant?

19         THE COURT:  Any objection?

20         MS. REGAN:  No objection.

21         THE COURT:  The record will so reflect.

22   BY MR. KIMURA:

23   Q.    Now, what was your role, if any, in that operation?

24   A.    I arrived after the apprehension of Mr. Rodriguez, and my

25   role was more of a floater.  So I was there while he was

1    detained on the front porch.

2    Q.   Okay.  So, first of all, did you hear the radio call --

3    any radio call that he was home?

4    A.   Yes.  There was radio that he had arrived at his house,

5    and that's when the apprehension was to begin.

6    Q.   And how much time had passed between the radio call and

7    when you showed up?

8    A.   I would say a few minutes.

9    Q.   Okay.  And what did you see when you got there?

10   A.   Mr. Rodriguez was apprehended in the driveway by case

11   agents, agents involved.

12   Q.   And do you know if he was handcuffed at that time?

13   A.   I do believe he was handcuffed.

14   Q.   Now, was he ever removed from that spot?

15   A.   Yes.  He was taken to the front porch area.

16   Q.   All right.  And who was talking to him at that time?

17   A.   I believe it was the case agent and Sergeant Green.

18   Q.   Case agent was who?

19   A.   Sean Mann.

20   Q.   Okay.  And did someone tell you at any point that he had

21   verbally consented to the search of his home?

22   A.   Yes.

23   Q.   All right.  Now, did you hear it?

24   A.   I did not hear it.

25   Q.   Okay.  Did -- do you know if at any point whether or not

1   he signed a consent form?

2   A.   Yes, he did.

3   Q.   Showing you what was previously marked as Exhibit B to the

4   defendant's motion.   And we'll use it as Government Exhibit

5   number 4.

6            Do you recognize Government Exhibit number 4?

7   A.   Yes.

8   Q.   How do you recognize it?

9   A.   That is a DEA-88 form, a consent-to-search form.

10  Q.   And is there anything else that you recognize on that

11  form?

12  A.   Just that the address is printed on the item to be

13  searched.   And Mr. Rodriguez's signature there, as well as

14  Special Agent Mann's witness signature.

15  Q.   Do you recognize your signature?

16  A.   Yes, I do.

17  Q.   Okay.   Is this a true and correct copy of -- of the form

18  that you provided to Mr. -- well, first of all, did you provide

19  this form at any point to Mr. Rodriguez?

20  A.   Yes.   Special Agent Mann provided it, and I witnessed it.

21  Mr. Rodriguez signed voluntarily.

22  Q.   Is this a true and correct copy of that form?

23  A.   Yes.

24            MR. KIMURA:   The United States moves to admit

25  Government Exhibit number 4, which was previously marked as

Maldonado - D - By Mr. Kimura

1  Defendant's Exhibit B.

2          THE COURT:  Okay.  Any objection?

3          Okay.  It's received.

4          I'm sorry?

5                  (Exhibit 4 received.)

6          MS. REGAN:  No objection.  I'm sorry.

7          THE COURT:  Oh, I thought I heard no.  Maybe I was

8  hearing things.

9          Go ahead, Mr. Kimura.

10  BY MR. KIMURA:

11  Q.   When was it signed?

12  A.   I don't know the exact time, but it was during the time

13  that Mr. Rodriguez was on the front porch.

14  Q.   Do you know if a safety sweep had already occurred?

15  A.   Yes.

16  Q.   And was a search of the home later executed as well?

17  A.   Yes.

18  Q.   When, in -- in chronology, was this -- the form signed?

19  A.   It was after the vol -- or the verbal consent.

20  Q.   Was it after the safety sweep?

21  A.   I believe -- yes.  Yes.  It was after the safety sweep.

22  Q.   Was it before the further search of the home?

23  A.   That -- I believe it was after the search.

24  Q.   This was after the search?

25  A.   After the safety sweep.

Maldonado - D - By Mr. Kimura

1   Q.   After the safety sweep.   Okay.

2            Was it before the search?

3   A.   No.   This was signed before the search.

4   Q.   Okay.

5   A.   And then the search occurred.   Sorry.

6   Q.   Sorry.   Sorry.   I was just trying to get the chronology

7   there correct.

8            Do you recall -- did you ever, at any point, tell

9   Mr. Rodriguez to shut up?

10  A.   No.   No foul language was used with Mr. Rodriguez.

11  Q.   Did you ever threaten him?

12  A.   No, sir.

13  Q.   Do you remember any other agent or officer telling him to

14  shut up, threatening him?

15  A.   No, I would have definitely remembered hearing someone

16  using foul language like that.

17  Q.   All right.   Do you remember -- can you describe the tone

18  of your -- the conversations with Mr. Rodriguez and how -- the

19  tone of it, basically?

20  A.   Yeah.   Everything seemed calm.

21           I do remember Sergeant Green, you know, talking to

22  him about the koi fish pond that was there.   And everything

23  seemed very calm and respectful.

24  Q.   Was Mr. Rodriguez polite?

25  A.   He was polite, yes.

1   Q.   Did Green and the others seem polite to him?

2   A.   Yes.  Everyone seemed polite.

3   Q.   Do you remember if at any point whether his father joined

4   or came over?

5   A.   I do remember the father walking across the street towards

6   us, but I'm not familiar who spoke with him.

7   Q.   Okay.  But do you know if anybody screamed or shouted at

8   him?

9   A.   No.  No.

10              MR. KIMURA:  Thank you, Agent Maldonado.

11              No further questions for this witness.

12              THE COURT:  Ms. Regan, any questions?

13              MS. REGAN:  May I have a moment with my client, your

14   Honor?  Just a second.

15              THE COURT:  Yeah.

16              (Pause, conferring.)

17              MS. REGAN:  Okay.  Sorry.

18                          CROSS-EXAMINATION

19   BY MS. REGAN:

20   Q.   So, Agent Maldonado, you said that you were a floater that

21   day?

22   A.   Yes.

23   Q.   Okay.  So did you get there after Mr. Rodriguez had

24   already been arrested?

25   A.   Yes.

1    Q.    Okay.  So he was already in handcuffs at that time?

2    A.    Yes.

3    Q.    Okay.  And so there was a period of time when he was there

4    with Agent Mann that you weren't there.  Isn't that true?

5    A.    Yes.

6    Q.    Do you know how long a period of time that was?

7    A.    I would say a few minutes.  Maybe two --

8    Q.    Okay.

9    A.    -- minutes.

10   Q.    Okay.  So -- okay.

11              And so when the consent form was signed, did -- did

12   you have the consent form with you the entire time, or did you

13   have to go get it?

14   A.    I believe it was in someone's vehicle, or it was maybe

15   brought to us.  I'm not -- I'm not sure.

16   Q.    Okay.  But was it done before or after the search?

17   A.    There was a safety sweep, and then this was brought.  It

18   was -- he had given verbal consent, and then he had signed this

19   form.  And then the search.

20   Q.    Okay.  So he signed the form after the search?

21   A.    No.

22   Q.    After --

23   A.    It was a safety sweep that had occurred at first.

24   Q.    Okay.  And you saw him sign the form?

25   A.    Yes.  I witnessed this form being signed.

Maldonado - X - By Ms. Regan                78

1   Q.   Okay.  And that was at his house?

2   A.   Yes.  It was on his front porch.

3              MS. REGAN:  Okay.  Okay.  I have no further

4   questions.

5              THE COURT:  Anything else, Mr. Kimura?

6              MR. KIMURA:  No, your Honor.

7              THE COURT:  Agent, let me ask you this.

8              Did Mr. Rodriguez raise any protest or complaints

9   or -- in connection with signing off on the consent form?

10             THE WITNESS:  No.  He signed it voluntary, and he had

11  acknowledged what he was signing.

12             THE COURT:  Okay.  Thank you.

13             May we excuse this witness?

14             MS. REGAN:  Yes.

15             THE COURT:  You're excused.  Thank you.

16             THE WITNESS:  Thank you, sir.

17             THE COURT:  And next, Mr. Kimura?  One last witness?

18             MR. KIMURA:  Yes, your Honor.  One last witness.

19             THE COURT:  Come on up here, sir.  We're going to

20  swear you in by the witness stand.

21             THE CLERK:  Please raise your right hand.

22             (Witness sworn.)

23             THE WITNESS:  I do.

24             THE CLERK:  Please take the stand.  Please state your

25  full name for the record, and spell your last name.

Mann - D - By Mr. Kimura

1       THE WITNESS:  My name is Special Agent Sean Mann,

2    M-A-N-N.

3       THE COURT:  Thank you, sir.

4       Go ahead, Mr. Kimura.

5                      DIRECT EXAMINATION

6    BY MR. KIMURA:

7    Q.  Agent Mann, who do you work for?

8    A.  I work for the Drug Enforcement Administration.

9    Q.  And how long have you worked for them?

10   A.  Approximately five years.

11   Q.  And what are your current assignment and duties?

12   A.  I'm currently assigned -- I recently transferred to the

13   Omaha, Nebraska, field division from the Imperial County

14   district office.

15   Q.  And where -- where were you assigned on February 27th,

16   2020, in your duties, then?

17   A.  I was assigned to the San Diego field division, Imperial

18   County district office.

19   Q.  And were you on duty on that date, approximately 11:30

20   a.m.?

21   A.  Yes.

22   Q.  What were you doing that day?

23   A.  That day, we were serving a federal arrest warrant.

24   Q.  Where did you --

25   A.  We served the federal -- or arrest warrant at the

Mann - D - By Mr. Kimura                                 80

1   defendant's residence.   It's 957 Palm View Avenue, El Centro,

2   California.

3   Q.   Who was the arrest warrant for?

4   A.   The arrest warrant was for the defendant, Mr. John

5   Angel --

6   Q.   John Angel?

7   A.   -- Rodriguez.

8   Q.   Do you see anyone here today that you recognize from that

9   day?

10  A.   Yes, sir.

11  Q.   Who do you recognize?

12  A.   The defendant, Mr. Rodriguez.

13  Q.   Can you identify where he's sitting and an article or a

14  color of the clothing that he is wearing?

15  A.   Yes, sir.   The defendant is sitting next to the defense

16  counsel.   He's wearing black glasses, a mustache, and a

17  white-colored collared shirt.

18           MR. KIMURA:   Your Honor, may the record reflect that

19  Agent Mann has identified the defendant?

20           THE COURT:   Any objection?

21           MS. REGAN:   No objection.

22           THE COURT:   The record will so reflect.

23  BY MR. KIMURA:

24  Q.   Now, can you tell me how this execution of the arrest

25  warrant occurred?

1  A.    Yes, sir.  That morning myself and other agents were

2  conducting surveillance of the location, in anticipation of the

3  defendant coming back to the residence where we were going to

4  serve the arrest warrant.  We noticed the defendant's truck

5  pull into the driveway.

6         At that time, myself and other agents exited our

7  vehicles in fully marked police gear.  Identified ourselves as

8  police.  And gave commands for the defendant to exit the

9  vehicle.

10 Q.    Now, did you have firearms visible at that -- brandished

11 at that time?

12 A.    Yes, sir.

13 Q.    All right.  Did you put hands -- did you, you know,

14 physically control the defendant at that time?

15 A.    No, sir.  We gave commands, and the defendant was 100

16 percent compliant with our commands.  And escalating was not

17 used that day.

18 Q.    Now, did you handcuff him?

19 A.    No, sir.

20 Q.    Did someone -- do you know if he was handcuffed at some

21 point?

22 A.    Yes.  One of the fellow agents was the contact agent, as

23 we had cover.  And he was handcuffed without incident.

24 Q.    Now, after he was handcuffed, did -- did everyone still

25 have their weapons out and brandished?

1   A.   No, sir.  Everybody holstered their weapons and secured

2   the rifles in their vehicles.

3   Q.   Okay.  Now, is this all happening in the driveway?

4   A.   Yes, sir.

5   Q.   All right.  Is he ever moved from the driveway?

6   A.   Yes, sir.

7   Q.   Where is he moved?

8   A.   We moved the defendant to the porch, in front of the door,

9   after he was in -- taken away from his vehicle.

10  Q.   And what did you do there?

11  A.   At that time we told the defendant who we were again, why

12  we were there.  We were there to serve a federal arrest

13  warrant.  And, yeah, basically talked about why we were there.

14  Q.   Did agent -- sorry.  Did Sergeant Green, at some point,

15  pull you aside?

16  A.   Yes, sir.  So when I was speaking to the defendant, mainly

17  explaining who we were, why we were there, we started to get

18  into some potential parading evidence in.  And Sergeant Green

19  pulled me aside.  The -- the supervisor on the side said, "Hey,

20  just make sure he's under *Miranda*."

21  Q.   All right.  And what did you do in response to that?

22  A.   At that time, I advised the defendant of his *Miranda*

23  rights.

24  Q.   Okay.  What happened next?

25  A.   After the defendant was advised of his *Miranda* rights, we

 1  began to speak about potentially anything else he may have.  We

 2  were aware of family in the house.  And the defendant

 3  eventually advised us in there was some stuff in the house.

 4  Q.   Did you threaten to ransack his house?

 5  A.   No, sir.

 6  Q.   Did you -- what, if anything, did you say to the defendant

 7  about his -- you know, your -- the search -- search of his

 8  home?

 9  A.   What we advised the defendant is a pocket consent to

10  search.  We wanted to minimize any disturbance to the

11  residents, as is proper with any enforcement activity that we

12  do, to the other people.  And if the defendant or the person

13  being interviewed at the time tells us exactly where we can

14  look, it will minimize the disturbance of the residents.

15  Q.   You said upon consent.  Did you ever receive consent to

16  search the home?

17  A.   Yes, sir.

18  Q.   When did you receive it?

19  A.   We received the consent before we went into the house to

20  search for the items that were specifically pointed out to

21  where to search.

22  Q.   Now, did you -- at any point, did you ever tell the

23  defendant to shut up?

24  A.   No, sir.

25  Q.   Did you ever -- other than what was necessary to help --

1   did you ever rough him up or physically assault him?

2   A.   No, sir.

3   Q.   Did you see any other agent tell him to -- or hear any

4   other agent tell him to shut up, or physically assault him?

5   A.   No, sir.

6   Q.   Can you describe the tone of your conversation with him?

7   A.   The tone of the conversation with the defendant was

8   extremely consensual and low-key.  He had been compliant the

9   entire time.  The defendant never raised his voice.  Agents

10  never raised our voice.  He was 100 percent compliant and very

11  easy going, I would say.

12  Q.   Now, did you ever have an opportunity to interact with his

13  father?

14  A.   Briefly.

15  Q.   All right.  What -- what -- what, if anything, did you --

16  did you deal with his father?

17  A.   I just remember speaking with his father.

18          He did advise me that he did see -- he suspected that

19  he did see our vehicles there earlier, from across the street.

20  And that he did suspect that it may have been law enforcement.

21  And he was appreciating the fact that we were there.

22  Q.   Now, I'm showing you what's on the screen right now.  It's

23  been marked as Government Exhibit 4.

24          And do you recognize Government Exhibit number 4?

25  A.   Yes, sir.

Mann - D - By Mr. Kimura                    85

1   Q.   Do you recognize any of the handwriting on that exhibit?

2   A.   Yes, sir.

3   Q.   What do you recognize?

4   A.   It's a standard DEA 88, consent-to-search form signed by

5   me at the bottom there, and the witness, SA Mann.

6   Q.   All right.  Is that -- do you recognize your signature?

7   A.   Yes, sir.

8   Q.   All right.  Do you recognize any -- do you know who filled

9   out the top part of the form?

10   A.   I did, sir.

11   Q.   Okay.  So do you recognize the handwriting of the address,

12   "957 Palm View Avenue," as yours?

13   A.   Yes, sir.

14   Q.   Did you fill out anything else besides your signature and

15   the address?

16   A.   The date, sir.

17   Q.   Okay.  The date of when it was signed?

18   A.   Yes, sir.  2-27-20, sir.

19   Q.   Did you witness the defendant sign this form?

20   A.   I did.

21   Q.   Now, there's only three letters.  But would he have -- had

22   he had the opportunity to review the form when he signed it?

23   A.   We advised the defendant that this was a written consent,

24   versus another step that we had; versus the verbal consent,

25   which we had at the time as well.

Mann - X - By Ms. Regan

1  Q.   Now, you don't remember when this was signed.  Correct?

2  A.   No, sir.

3  Q.   All right.  And so you don't know, in time -- in

4  chronology when this was signed.  Is that correct?

5  A.   Yes, sir.

6  Q.   Okay.  But you remember getting verbal consent before you

7  went into the home?

8  A.   Yes, sir.

9        MR. KIMURA:  No further questions, your Honor.

10        THE COURT:  Ms. Regan.

11                    CROSS-EXAMINATION

12  BY MS. REGAN:

13  Q.   Hello, Agent Mann, how are you?

14  A.   Very well.  Thank you.

15  Q.   Okay.  So when you went to Mr. Rodriguez's house that day,

16  you went with an arrest warrant, not a search warrant.  Right?

17  A.   Yes, sir -- yes, ma'am.

18  Q.   So you didn't have a search warrant?

19  A.   We did not have a search warrant.

20  Q.   Okay.  Do you recall Mr. Rodriguez asking you if you had a

21  search warrant?

22  A.   I do not recall specifically.  I remember him asking about

23  an arrest warrant.

24  Q.   All right.  And when -- let's see.

25        When you read him his *Miranda* rights, did you read it

Mann - X - By Ms. Regan

1    off of the card, or how did you read them to him?

2    A.    We had a card that's given to us.  DEA 13(b) card.  And

3    it's the standard *Miranda* rights warnings.

4    Q.    Okay.  And so that day you pulled up the card and read him

5    the rights like you do all the time?

6    A.    Yeah, I had them in my wallet.

7    Q.    Okay.  And did he sign a *Miranda* waiver?  Do you know?

8    Did you have --

9    A.    He did not sign the *Miranda* waiver at that time.  He

10   signed the *Miranda* waiver when we got back to the office, and

11   we were conducting an additional interview.

12   Q.    Okay.  And you said he did give a consent.  But you said

13   that was -- was that prior to the -- the safety sweep or after?

14   A.    I was not part of the safety sweep.  To my knowledge, the

15   agents went in and did a safety sweep quickly.  And when they

16   came out, it was clear, we started talking with the defendant.

17            But it was -- the verbal consent to actual search was

18   after the safety sweep.

19   Q.    Okay.  And you said you don't know when the consent form

20   was signed.  Do you remember somebody having to go get the

21   consent form?

22   A.    I don't recall having it.  We do have them in our

23   vehicles, though.

24   Q.    Okay.  But the consent form doesn't have a time on it,

25   does it?

1   A.    No, it does not.

2   Q.    So it could have been signed at any time that day?

3   A.    Potentially, yes.

4            MS. REGAN:   Okay.   No further questions.

5            THE COURT:   Okay.   Anything else, Mr. Kimura?

6            MR. KIMURA:   Yeah.

7                          REDIRECT EXAMINATION

8   BY MR. KIMURA:

9   Q.    Just so we're clear -- and actually I apologize for this.

10            You referred to an interview afterwards.

11            Did you -- did you watch that -- were you able to

12   watch that video -- the interview?

13   A.    Yes, I went back and reviewed it.

14   Q.    Now do you recognize this scene from the video?

15   A.    Yes, sir.   That is myself and Special Agent Carpenter with

16   ATF.

17   Q.    Is that the interview you're referring to?

18   A.    Yes, sir.

19   Q.    And, just for the record, that is previously filed as

20   Exhibit -- as part of Exhibit number 1, file number 0004.

21            Is that a true and correct copy of the interview that

22   you did that day?

23   A.    Yes, sir.

24   Q.    And you mentioned there was a *Miranda* form that he signed

25   on that day?

Mann - ReD - By Mr. Kimura

1    A.    Yes, sir.

2    Q.    Did you ever find that form?

3    A.    We did not find that original form.

4    Q.    All right.  I'm going to show you what's been marked as

5    Government Exhibit number 3.

6              Do you recognize Government Exhibit number 3?

7              THE COURT:  You need to switch over the screen, the

8    doc cam.

9              MR. KIMURA:  Oh.

10             THE WITNESS:  Yes, sir.

11   BY MR. KIMURA:

12   Q.    What is Government Exhibit number 3?

13   A.    It's a standard DEA 13 form, advising the defendant of the

14   *Miranda* warnings.

15   Q.    And was that the form that he was presented with during

16   the interview?

17   A.    Yes.

18   Q.    And did he sign that form?

19   A.    Yes.

20   Q.    And did he agree to provide you statements?

21   A.    Yes.

22             MR. KIMURA:  All right.  The United States -- I would

23   apologize, your Honor.  I should have gone to this sooner, the

24   original.  But we move Government Exhibit number 3 and the

25   videotape that's already on Government Exhibit number 1, ending

1   in 004, into evidence.

2           THE COURT:  Any objections as far as 3?

3           MS. REGAN:  I guess foundation, your Honor.  Object

4   on foundation, that if -- I'm just kind of confused.

5           You're offering to show that he signed the form?

6           MR. KIMURA:  No.

7           THE COURT:  He's offering it as an exemplar of the

8   form that was used but now is not available.

9           MS. REGAN:  Okay.  That's fine.  No objection.

10          THE COURT:  Okay.  So the Exhibit 1, 0004 and Exhibit

11  3 are admitted.

12          Anything else, Mr. Kimura?

13                  (Exhibit 1 received.)

14

15                  (Exhibit 3 received.)

16          MR. KIMURA:  No, your Honor.

17          THE COURT:  Any other questions, Ms. Regan?

18          MS. REGAN:  No, your Honor.

19          THE COURT:  All right.  May we excuse Agent Mann?

20          THE WITNESS:  Thank you.

21          THE COURT:  You're excused.

22          And then the Government have any other witnesses?

23          MR. KIMURA:  No, your Honor.

24          THE COURT:  The defense have any witnesses on the

25  issue?

1        MS. REGAN:  I do have his father, your Honor.  That

2   we already filed -- signed the declaration.  I'm just wondering

3   if it's going to be redundant or -- may I just have a moment,

4   please?

5        THE COURT:  Yeah.

6        MS. REGAN:  (Pause, referring.)

7        I'm going to call Mr. John Flores Rodriguez, my

8   client's father, your Honor.

9        THE COURT:  Okay.  Bring him on.

10        THE CLERK:  Please raise your right hand.

11        (Witness sworn.)

12        THE WITNESS:  I do.

13        THE CLERK:  Please take the stand.

14        THE WITNESS:  Yes.

15        Could I have patience because I --

16        THE CLERK:  No problem.  We're not in a hurry.  Take

17   your time.

18        Okay.  Now, please state your full name for the

19   record, and spell your last name.

20        THE WITNESS:  My last name is John Rodriguez.

21        And --

22        THE COURT:  You want to spell the last name?  That

23   was the question.

24        THE WITNESS:  Okay.  R-O-D-R-I-G-U-E-Z.

25        THE COURT:  Thank you, sir.

1          You appear nervous, so just relax.

2          THE WITNESS:  Yes.

3          THE COURT:  I have read the entire declaration.  So

4    rather than repeat it all, if you would like to delve into

5    particular areas of import, feel free, Ms. Regan.

6          MS. REGAN:  Okay.

7                    DIRECT EXAMINATION

8    BY MS. REGAN:

9    Q.   Mr. Rodriguez, you were there the entire time the police

10   were there that day?

11   A.   Yes.  I was there, sitting, and -- on a bench in front of

12   the house.

13   Q.   Okay.  And what -- what did you see when the agents first

14   got there?

15   A.   Okay.  When I got there and I sat down, I seen, already,

16   somebody in the -- inside the house.  Just a woman that --

17   she -- she searched the house.  And I was looking and hearing,

18   but I didn't say nothing.  I was just listening.

19          And I -- my son asked him, "Where is the warrant?"

20   Never -- never seen a warrant.  I was there, you know.

21   Q.   Did you hear anybody tell him anything?  The agents?

22   A.   No.

23   Q.   When he asked about the warrant, did the agents respond to

24   them?

25   A.   They didn't -- they didn't answer.  They were just waiting

Rodriguez - D - By Ms. Regan           93

1   for somebody.  I don't know who.  And they were just up and

2   down.

3           And, like I said, I would look and listen and hear.

4   But I didn't see no paper, no warrant, nothing.

5   Q.   Okay.  So let me see.  Okay.  And but -- okay.  And you

6   signed the declaration.  I just -- I guess we'll just go over

7   it.

8           So how many agents would you say there were that day?

9   A.   Well, to tell you the truth there were quite a few.

10  But -- I don't know how many, but they were there.  They were

11  there, like -- there was some in the street.  And there were a

12  couple in -- underneath the patio.  And there were -- a lady

13  inside.  And -- and the guy was asking my son questions.

14  Q.   Um-hmm.

15  A.   And my son --

16          THE COURT:  I think you've answered the question.

17  The question was how many.  Let's go on to the next.

18          MS. REGAN:  Okay.

19          THE COURT:  Whatever is not already covered in the

20  sworn declaration.

21          MS. REGAN:  Right.

22  BY MS. REGAN:

23  Q.   Okay.  Because, in your declaration, you stated that you

24  heard the agents tell him to shut up, and that they didn't have

25  to show him the warrant.  Is that right?

Rodriguez - D - By Ms. Regan      94

1   A.    Right.   That's correct.

2   Q.    Okay.   So you did hear them say that?

3   A.    Right.

4   Q.    Okay.   And did you hear him give consent to search the

5   house?

6   A.    That I know of, no.   They were just in there already, when

7   I got there.   And I sat down on the bench.

8   Q.    Okay.   And when you got there, was -- was John -- was your

9   son also there?   Or no?

10  A.    No.   No.

11  Q.    Okay.   So when you got to the house, the agents were

12  already there?

13  A.    They were already there.

14  Q.    And your son was not there yet?

15  A.    My son -- my son, when he arrived, I was still across the

16  street.   Okay?   And then they arrived.   Then they got him.

17  Then my son called me to get his stuff.

18           And I said, I'm already here.   So I sat down on the

19  bench.   And there -- like I said, there were quite a few

20  detectives, or whatever you want to call it.

21           But I didn't see no paper, no warrants, nothing.   And

22  they had already searched the house, without a warrant,

23  without -- with no paper, you know.

24           And they were just walking up and down.   I don't know

25  who they were waiting for, but I was there.

1    THE COURT:  You answered the question.  Let's stick

2  to the question/answer format, not narratives.

3  BY MS. REGAN:

4  Q.   So when -- your son was out in the driveway at the time,

5  you said, when the agents were in the house?

6  A.   They were in the house.

7  Q.   Okay.  But he wasn't on the porch bench yet, was he?

8  A.   No.

9  Q.   Okay.  He was still in the driveway?

10  A.   Yes.

11    MS. REGAN:  Okay.  I don't have any further

12  questions.

13    THE COURT:  Okay.  Mr. Kimura.

14    MR. KIMURA:  Very briefly.

15               CROSS-EXAMINATION

16  BY MR. KIMURA:

17  Q.   Mr. Rodriguez, is there a koi pond on your son's property?

18  A.   There's what?

19  Q.   A koi pond?

20  A.   What is that?

21  Q.   A fish pond?

22  A.   Yes, there is.  Yes.

23  Q.   Did you build it with him?

24  A.   Yes, I did.

25  Q.   All right.  And is there a netting over it?

Rodriguez - X - By Mr. Kimura                              96

1   A.    There's what?

2   Q.    Netting over the pond?

3   A.    There was one there -- there.  There was, yes.

4   Q.    Do you recall having a conversation with one of the

5   officers about building that fish pond with your son?

6   A.    Well, me and my son built it, you know, so -- we put a net

7   because the birds were getting the fishes, and they were eating

8   them.  You know.

9   Q.    But my question is, do you recall having a conversation

10  with one -- one of the agents or officers about that?

11  A.    About the pond?  No.

12          MR. KIMURA:  Okay.  No further questions, your Honor.

13          THE COURT:  Okay.  Anything else?

14          MS. REGAN:  No, your Honor.

15          THE COURT:  Okay.  You're excused, sir.  Thank you.

16          Any other witnesses then, Ms. Regan?

17          MS. REGAN:  No, your Honor.

18          THE COURT:  Then, Ms. Regan, if you would like to sum

19  up your position here, in light of the evidence, now would be

20  the time.

21          MR. KIMURA:  Yes, your Honor.

22          Do you mind if I briefly invite my witnesses in?

23          THE COURT:  Oh, I don't mind.

24          I'll let Ms. Regan go first.  You can bring your

25  witnesses in, and then she can talk.

Colloquy                      97

1        MS. REGAN:  And can I bring mine in, too?

2        THE COURT:  He's welcome to stay.

3        MS. REGAN:  Okay.  You can stay.  But let me get your

4   wife and everything, too.

5            (Pause, off-the-record discussion.)

6        THE COURT:  We'll wait a second for Mr. Rodriguez to

7   return.

8            (Pause.)

9        THE COURT:  He is back, as are some others.

10       Okay, Ms. Regan.  So tell me about the issue in light

11  of, now, everything that we've heard.

12       MS. REGAN:  Well, your Honor, as the Court knows, the

13  Fourth Amendment states the right of the people to be secure in

14  their persons, houses, papers, and effects against unreasonable

15  searches and seizures shall not be violated and no warrant

16  shall issue but upon probable cause, et cetera, et cetera.

17       THE COURT:  I understand the law.  Let's get to

18  probable cause.  This is oral argument for the Court of

19  Appeals.

20       MS. REGAN:  Okay.  Your Honor, it seems that based

21  upon the witness testimony, Mr. Rodriguez was attacked at this

22  Jack-in-the-Box location by these two people who are known

23  criminals.  There's no relationship between him and them.  He

24  didn't know them.  They didn't know him.

25            It appears that he had blocked the way.  You know,

Colloquy

98

1  the -- the -- the parking lot, when he went to get his soda.

2  And, because of that, they attacked him and then looked in his

3  truck.

4         These are people who have prior, you know, crimes.

5  The fact that they looked in his truck doesn't mean anything;

6  that he's some sort of a criminal.

7         I mean, the Government is going on the theory of

8  totality of circumstances.  But really, your Honor, when we

9  have -- the reason that the truck was searched is because it

10 smelled like marijuana.  All of these other reasons, when --

11 when you look at it -- I mean, for example, when they looked --

12 when people -- he had a backpack in his car.  A couple of the

13 officers testified about that.  Regular people have backpacks.

14 The fact that he has a backpack in his truck does not mean that

15 he's a criminal or that he's a drug dealer or that he's up to

16 illegal activity.

17        The fact that he drives that truck to this large

18 residential area in El Centro, called the east side, doesn't

19 mean that he is involved in some kind of criminal activity.

20        I think the totality of the circumstances and the

21 testimony that all of the officers had, there was a lot of

22 speculation, a lot of -- it's a very small town.  They know a

23 lot of different people.  But nobody knows my client.  Nobody

24 knew my client to be involved in any sort of illegal activity,

25 whatsoever.

Colloquy

1          He had been seen with a person, allegedly, at a

2    doughnut shop, who was a known drug dealer.  But we don't know

3    what he was talking to her about.  It doesn't just follow that

4    because of that, you know, he is involved in some kind of

5    illegal activity.

6          Your Honor, the dog alerted.  And Officer Magana

7    testified that his dog is trained to alert to marijuana.  If

8    there was anything else in the car, it wouldn't matter.  The

9    dog would have alerted on the marijuana.  I mean, you know, we

10   know --

11         THE COURT:  We don't know that the dog alerted just

12   on the marijuana.

13         MS. REGAN:  Right.

14         THE COURT:  We know there was marijuana use --

15         MS. REGAN:  Right.

16         THE COURT:  -- involved.

17         But I asked the question.  The dog is not going to

18   speak to us and say, oh, there's marijuana here but there's

19   nothing else.  The dog alerts to a panoply of drugs to which it

20   is trained.

21         MS. REGAN:  Right, your Honor.  But, I mean, the

22   officers, themselves, could smell marijuana.

23         So that, it appears, in the initial police reports

24   was all about, you know, the reason that they searched the car

25   was based on the marijuana.

Colloquy

1          The case law -- although it's not settled yet -- I

2    mean, the Fourth Amendment applies.  The fact that marijuana is

3    legal now in California, if something is legal and -- he could

4    have had a legal amount of marijuana in the car.  It could have

5    just been smoke from a legal -- or a smell from a legal amount

6    of marijuana.  The fact that he -- that the marijuana was in

7    the car does not mean that he was committing some other sort of

8    crime.

9          And so based on that and my -- my papers, your Honor,

10   and the case law, the Court should find that my client was --

11   there were not a totality of circumstances.

12         That he's -- there's no evidence that he is a drug

13   dealer or that he's doing illegal activity at all when he's a

14   victim of a violent attack outside of a -- a Jack-in-the-Box,

15   in a high-crime area of El Centro.

16         And we also had the officer testify that it's a

17   high-crime area not for even drug dealing but for, you know,

18   transient crimes, crimes against people, drug crimes.  You

19   know, just all sorts of different crimes that occur at that

20   nexus of -- of El Centro.  So with that, your Honor, I would

21   ask the Court to suppress the evidence.

22         As far as the -- what happened at his house, your

23   Honor, I think that is fruit of the poisonous tree.  But if

24   not, your Honor, my client has filed a declaration, his father

25   has filed a declaration that he did not give consent to search

1   at the time.  He -- he did give a consent at a later time.

2   That's when he signed the form.

3                   So on that, your Honor, I'll rest.

4                   THE COURT:  Okay.  And, Mr. Kimura, what would you

5   like to say about all of this?

6                   MR. KIMURA:  Yes, your Honor.

7                   So, I think what we were trying to do today was

8   trying to give the context for the body-worn cameras that we

9   had submitted as part of our opposition.  Obviously, there are

10  portions of it that are hard to understand and there's

11  background that needed to be filled in.

12                  I think with the background here, obviously, is that

13  these officers are very familiar with the area.  They're

14  actually very familiar with all of the participants that were

15  involved in this -- the assault.

16                  And you can see them, in chronology, kind of going

17  through.  Hey, this seems weird that he got assaulted.  And --

18  first of all, that he was assaulted and he doesn't want to

19  press charges.  And why did they open the door when he did

20  that?  Oh, I know these people.  They're involved in robberies.

21  They're also drug users.  Hey, I recognize this car; from his

22  interaction, you know, a couple of -- you know, sometime in

23  the -- in the near past, with another known drug dealer.  Maybe

24  she's his connect.  And then you see them putting things

25  together.

Colloquy

1        And all of that is actually very interesting and all,

2   thankfully, put together by the body-warn cameras.

3        But, really, what the coup de grâce here is you see

4   the dog walk up to the door and then sit.  Right?  And I

5   completely agree.  We can't -- we don't know what he was

6   alerting to.  But there -- that's the interesting legal

7   question in this case, is -- you know, I understand that she

8   cites state law cases.  And even I bring forth a Ninth Circuit

9   case where they say, no, under state law, that's -- you know,

10  the odor of -- of marijuana by itself isn't sufficient.  But

11  under federal law, that is not correct because it's still

12  illegal under federal law.  And it doesn't matter that they're

13  state officers, and it doesn't matter that they're not part of

14  a federal investigation.

15       The Supreme Court and the Ninth Circuit has held that

16  the unqualified rule is federal law applies in these cases.

17  Because, otherwise, you would have 50 sets of laws that would

18  change from time to time, and we need to have one general rule,

19  unless -- unless the state law is implicitly entwined with the

20  powers of the officers.

21       And so that's what we're -- we're arguing here.  Is,

22  first, there was probable cause based upon this search -- I

23  mean, excuse me, based upon their investigation.  And you can

24  see it documented into the testimony.  And that ultimately

25  culminates in the dog sniff.

Colloquy

1        Second, even if that -- the dog sniff itself --

2   because the dog is certified.  It's trained.  It's reliable.

3   Is itself probable cause.  And even if you accept -- which I

4   don't think is correct -- that the odor of marijuana should be

5   somehow discounted, there is still -- even in the state cases

6   that they cite, they still go back to the probable -- to the

7   totality of circumstances rationale in that it is -- it has

8   become another factor that they're using here.

9        So we think we win on all three levels.  We think we

10  would win under, you know, the investigation with the dog

11  sniff.  The dog sniff alone or under state law, with the

12  totality of circumstances analysis and at that.

13       With regards to the consent search of the house, the

14  consent search of the house -- I wish -- I told the officers, I

15  wish we had the body-worn cameras here.  But I think what is

16  telling, and what we brought Sergeant Green here for is, you

17  know, he's telling them, you know, the defendant and his --

18  says that, you know, we're telling him shut up.  And we're

19  bullying him.  But how else is Sergeant Green going to have

20  this conversation about the koi pond?  Right?  We're not

21  telling somebody shut up and don't talk and then having this

22  casual conversation about the koi pond.

23       And, you know, he gets -- you know, Mr. Rodriguez

24  testified exactly the same kind of information that agent --

25  Sergeant Green talked about.  And there's no way for Sergeant

Colloquy

1   Green to have had that -- gotten that information unless he got

2   it from either the defendant or his father.

3          And so while it's not relevant to -- specifically

4   relevant to the consent, I think it speaks to the context of

5   the energy that was happening here and whether or not it was

6   polite, and whether or not the interaction was -- was, you

7   know, threatening or not.

8          And then we have, of course, the -- the signed

9   consent form.  And while I wish it was a little bit -- it had

10  different verbiage, it can't be more simple.  Right?  It has

11  three questions.  Agent Mann says he fills out everything but

12  the signature line.

13         Says, I -- you know, identifies a place if it's going

14  to be searched.  It says -- and it has -- and I -- I forget

15  what the second line is.  But then it says --

16         THE COURT:  Haven't been threatened and that I freely

17  consent.

18         MR. KIMURA:  Yes.

19         THE COURT:  Those are two --

20         MR. KIMURA:  And if you actually look at the other

21  two interviews, you know, it's not surprising that he consents.

22  Because in the interview with the ECPD officers, again, he's

23  given *Miranda*.  He's talking to them.  He's very polite.  And

24  then he gives them consent to search his phone.  And then, you

25  know, a few days later, he gets arrested by the DEA on federal

Colloquy

1    search charges.  And then he consents to the search of his

2    home.  And, you know, yes, there is a -- I think what is

3    happening here is they're confusing the safety sweep, which we

4    admit happened but nothing was found during that safety sweep,

5    and the search of the home that came after the verbal consent

6    and the signed search warrant -- or the signed waiver.

7             And then you see -- we also admitted the interview

8    from that.  And, again, this is very calm.  There's no

9    threatening -- there's no, like, why did you throw -- you know,

10   tell me to shut up.  It's a very calm interview.  Everybody's

11   respectful.

12            And so we think that the context, you know, from the

13   very start to the very end is kind of consistent.  All of these

14   officers are treating the defendant with respect.  It's very

15   nice.  There is no threatening action.  And, you know, the

16   defendant consents all the way through.  The only thing he

17   doesn't consent to is the search of the vehicle, but that's

18   because they don't have to.

19            So for those reasons, your Honor, we think that the

20   search of the vehicle was proper.  And we also think the search

21   of the home, based solely on consent, was proper, as well.

22   Because we admit there was no search warrant.

23            THE COURT:  Okay.  And then anything final -- any

24   final analysis, Ms. Regan?

25            MS. REGAN:  Your Honor, I just don't want to beat a

Colloquy

1   dead horse.  But my client was attacked by these criminals.

2   The testimony is that he did not know them, they did not know

3   him.  If they were going to rob him, it wasn't because they

4   thought he was some sort of a drug smuggler --

5          THE COURT:  How do we know that?  We don't know.

6   See, here's the problem.  The officers don't do a full

7   investigation and talk to everybody and then months later go

8   back and say, well, now, we want to search your truck.

9          MS. REGAN:  Right.

10          THE COURT:  It doesn't work that way.

11          And it doesn't matter if he knew them or not.  What

12   matters is the perception of the officers based upon the facts

13   that day.

14          So, you know, the only thing that is in -- you agree

15   on is that Mr. Rodriguez was cooperative.  And we give him

16   credit for that.  But you're focusing on things that really

17   aren't relevant to the issue of what the officers' facts and

18   circumstances before them were that led to the decision to

19   search.

20          MS. REGAN:  Right.

21          THE COURT:  Whether he knew them or not, they don't

22   know that, and they may never know that.

23          But what they know is he's been seen with a known

24   drug dealer.  He's been in this suspicious area.  And the

25   people he has this encounter with are criminal -- have criminal

107

Colloquy

 1  histories, including drugs.

 2          And then that's about all we know.  And the question,

 3  is, is that enough?  I disagree with your assessment that it's

 4  merely a smell of marijuana, and that's the whole case.

 5  There's a whole lot more going on.  We heard that from four of

 6  the six officers, in terms of their knowledge of the area and

 7  the people involved in this transaction.

 8          So anything else you want to add beyond that?

 9          But I don't -- I think it's nonproductive to talk

10  about what these people were intending or not.  It's what it

11  appears to have been intended that is the -- is the issue.

12          MS. REGAN:  Right.  Well, your Honor, my -- from the

13  original case, the police reports, everything, it -- it

14  seems -- I mean, I know the totality of circumstances they're

15  talking about.  But I think that a lot of it was based on

16  hearsay.  A lot of it, you know, was -- were innocent things.

17          But they're taking them -- the officers, when

18  cross-examined on it, admitted that these are not specific

19  things that -- you know, of a bad person or a criminal would

20  do, having a backpack.  Having somebody look in his car.

21  Having, you know, all of these different, you know, things

22  happen.  Being in a strange area and being with that person

23  that one time in a doughnut shop.

24          So I just -- the totality of the circumstances does

25  not support the search, your Honor.

Colloquy

1          THE COURT:  But you're parsing each one and saying

2     that's nothing abnormal, that's not illegal, that's not

3     illegal.  When you add them all up at the end of the day, the

4     totality of the circumstances raise a reasonable suspicion,

5     probable cause.  Whether it's hearsay or not, it doesn't

6     matter.  It is whether or not under the totality of the

7     circumstances there were facts that warrant the probable cause

8     to believe that a crime was committed or contraband was on

9     site.

10          And we've got the automobile exception under federal

11    law, the potential for that vehicle to disappear with purported

12    contraband is real.  And I disagree that state law somehow

13    trumps this.  That's a bad word, I guess, to use, in some

14    circles.

15          But I don't think it does.  I think it's a federal

16    case.  Federal law at the end of the day will control.  And a

17    totality of the circumstances analysis leads the Court to find

18    that there's probable cause to believe that there was

19    contraband or a crime afoot, given the totality of the

20    circumstances.

21          The dog sniff cannot be ignored, nor can it be

22    eliminated merely because marijuana is a legal substance in

23    some quantities in California; not in all circumstances,

24    certainly.

25          So I'm going to deny the motion to dismiss for lack

Colloquy

1    of probable cause.  On the search of the vehicle, I find the

2    facts support that.  I don't think it's simply a, oh, they

3    smelled marijuana.  It's well beyond that.

4            Therefore, I would deny the request to -- to suppress

5    evidence found at the scene on any sort of

6    fruit-of-the-poisonous-tree analysis.  Since there was PC in

7    the first place, those facts and circumstances would support

8    the later arrest.

9            And I find the consent was freely given -- there is

10   some confusion about the safety search and the real search.

11   But we've got multiple officers who credibly testified that

12   they received consent, and we've got the form that supports

13   that.  So I'll deny the motion on that ground as well.

14           That would resolve all of those issues, with the

15   motions being denied in their entirety.

16           Leaving me to ask, what's left to be done here

17   besides maybe setting a trial date?  Anything?

18           MS. REGAN:  Your Honor, we could set a status date.

19           THE COURT:  That wasn't my question.

20           What's left to be done?  Is there anything else that,

21   discovery wise, hasn't been completed?  Any dispositive motions

22   that now have not been presented?

23           MS. REGAN:  I don't think so, your Honor.  I think --

24   do you have any more discovery?

25           MR. KIMURA:  No, your Honor.  I believe, we believe a

Colloquy

 1  trial date is in order here.

 2          THE COURT:  Okay.  As you all know, circumstances are

 3  limited -- or options are limited.  But I just had August 24th

 4  open up, a couple months from now.  So how about August 24th,

 5  at 8:30, for the jury trial in this case?

 6          MS. REGAN:  Your Honor, I'm supposed to be out of

 7  town the last two weeks of August.  I'm sorry.  Is there any

 8  way we could do it a different date?

 9          THE COURT:  I'm looking.  (Pause, referring.)  No,

10  that's moved.

11          How about August -- August 10th?

12          MR. KIMURA:  Your Honor, I actually have a trial

13  scheduled the week after that.

14          THE COURT:  So may run afoul there, huh?

15          MR. KIMURA:  Yes, your Honor.

16          THE COURT:  How about November 30?  That's a little

17  further out, but I'm otherwise double/triple set the rest of

18  the interim period.

19          MS. REGAN:  That's fine with me, your Honor.  I don't

20  have anything that far out yet.

21          THE COURT:  November 30, at 8:30, Mr. Kimura?

22          MR. KIMURA:  That works for the United States, your

23  Honor.

24          THE COURT:  Okay.  So that will be the date for

25  trial.  We'll set a motion in limine hearing -- how about

111

Colloquy

1   November the 1st at 3:00 p.m., with motions to be filed by

2   October 18, and oppositions October 25th.  No written replies.

3            We'll hear or determine those November 1st, and then

4   trial will be November 30th, at 8:30.

5            Sound like a plan?

6            MR. KIMURA:  Yes, your Honor.

7            MS. REGAN:  Sounds like a plan, your Honor.

8            THE COURT:  And then the week before trial, of

9   course, the exhibit lists and the jury instructions, including

10  the verdict form, need to be submitted.  I'll exclude time

11  under the Speedy Trial Act through the November 1st in limine

12  hearing to give you time to prepare those evidentiary matters,

13  so that we can have the trial on the merits at that point.

14           Anything else we need to address, then, for today?

15           MR. KIMURA:  Not that I'm aware of, your Honor.

16           MS. REGAN:  I don't think so, your Honor.  Thank you.

17           THE COURT:  All right.  Thank you, folks, very much.

18  Thanks to all the witnesses.  And we'll be in recess until

19  1:00, we'll be back.

20           (Conclusion of proceedings at 12:20 p.m.)

21

22                         -0-

23

24

25

Colloquy

112

1

2

3

4                                --oOo--

5

6   I certify, by signing below, that the foregoing is a correct

7   stenographic transcript of the oral proceedings had in the

8   above-entitled matter this 8th day of August, 2021.   A

9   transcript without an original signature or conformed signature

10  is not certified.   I further certify that the transcript fees

11  and format comply with those prescribed by the Court and the

12  Judicial Conference of the United States.

13

14          /S/ Amanda M. LeGore
          _____

15          AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

16

17

18

19

20

21

22

23

24

25